SALMON, *appellant*, and STUYVESANT, *respondent.*

A devise, void as to the *limitations* created thereby, is void also as to the directions for the *apportionment* of the estate among the beneficiaries, where such apportionment is different from the rules established by the statute of descents.

How far a will, *invalid* as to some of its provisions, can be sustained as to others not in conflict with the statute regulating the devise of real estate; and when a will will be avoided *in toto*, on the ground that by declaring void portions of it, the main intent of the testator is defeated—considered and discussed by Mr. *Justice* COWEN.

APPEAL from chancery. In October, 1828, the father of the respondent made and published his last will and testament, whereby he devised all his real estate to his executors *in trust*, to make partition of the same into *nine shares ;* that it to say, *six shares each of five undivided forty-second parts*, the whole into 42 equal parts to be divided, and *three shares each* of four undivided forty-second parts ; and to convey one of the shares of $\frac{5}{42}$ parts to the use of *each* of his *six sons*, (of whom the respondent was one,) for and *during his natural life*, with power to lease, devise and appoint the same as follows ; to make leases for a life or lives or terms of years of all or any part of his share, so that every such lease should take effect in possession, and should not be for a longer period than a life or lives in being at the time of the making thereof, or for a longer term of years than 63 years ; and the testator further empowered each of his sons, by his last will and testament, to devise and appoint the land conveyed to him for life, to or in trust for any one or more of his children, grand-children, nephews and nieces, for such estates and subject to such powers as he should think fit ; and for want of such appointment, that the land should go to the children of such son, and to the children of any child of such son who might have died before him, and their heirs, as tenants in common : the child or children of a deceased child of such son to take such share as his, her or their parent, if living, would have been

entitled unto ; and if such son should die, leaving no child or grand-child him surviving, then for want of such appointment, the real estate to go to the testator's right heirs.    In respect to the *daughters*, he directed the executors to convey *one share of four forty-second parts* to such trustees as should be named by *each* of his daughters *in trust, to allow such daughter to receive the rents and profits thereof* during her natural life ; and then conferred the same powers upon the *daughters* which he had conferred upon the *sons*, to make leases and appoint by will how her share should go after her death.    In February, 1833, the testator made a *codicil* to his will, in which, after adding three to the number of his executors, and giving directions in reference to payments made, and responsibilities assumed by him for his sons-in-law, he *republished* his will made in October, 1828.

The respondent filed a bill in chancery against the appellant, praying a decree for a specific performance of a contract.    After setting forth the will and codicil, he alleged that *partition* had been made of the real estate whereof his father died seised, *according to the shares as directed by the will;* that a certain house lot, in the city of New-York, had fallen to his share, and had been conveyed to him ; that on the 2d June, 1834, a contract was entered into between him and the appellant, whereby he agreed to convey that lot to the appellant, who agreed to pay him for it the sum of $800 ; and that subsequently the appellant had given him notice that he would not accept a deed of the lot, or pay the money, as he had been advised that the respondent could not convey to him a title to the lot in fee simple absolute.    The respondent then stated that he had been advised that the will and codicil must be interpreted and governed by the revised statutes of the state, which render *void* the provisions giving the power to lease the estate for 63 years, and that consequently *the whole will is void* as it respects the real estate, and that it descends to the *heirs at law* of the testator ; or if the will is to be deemed valid, that it is to be esteemed a devise by the testator to his children in *fee simple*.    He stated the peculiar circumstances of the property whereof the testator died seised,

and averred that if the estate was not vested in the heirs in fee simple, and the power of leasing was shortened from 63 to 21 years, great injury would ensue to the heirs and that it was manifest if the testator had been apprized that such would have been the operation of the revised statutes, he would have *annulled* the will. He insists, that either on the ground of the invalidity of the will, or if the will is to be deemed valid as a devise, then that by a true interpretation thereof the estate is devised *in fee* to the heirs of the testator, and thus he, the respondent, has a perfect title to the lot in question; wherefore he prays that the appellant may be decreed specifically to perform the agreement by paying the money, &c.

The appellant in his answer insists that the will is void only so far forth as it respects the provisions giving power to lease for a term exceeding 21 years, and that under it an estate in fee simple did not pass to the children of the testator; and that therefore the respondent has not the title, and cannot convey the lot in fee simple.

The cause was brought to a hearing upon the bill and answer before the chancellor, who *decreed* that the power contained in the will of the testator, authorizing his sons and daughters to devise and appoint their respective shares to or in trust for their children, &c. for such estates, &c. as they should think fit, is illegal and void, and that the limitation over of the ultimate remainder is also void, and that consequently the real estate of the testator upon his death descended to his heirs at law. The chancellor, however, further decreed, that the directions of the will as to the distribution of the estate in the manner prescribed were valid, and the *sons* of the testator were accordingly respectively entitled each to $\frac{5}{42}$ parts of the estate, and the daughters only to $\frac{4}{42}$ parts thereof; that the partition made of the estate in pursuance of the will should be deemed a valid distribution, that the respondent therefore, could convey an absolute estate of inheritance in fee simple in the lot in question, and he accordingly directed the defendant below specifically to perform the agreement. The defendant appealed. The cause here was argued by

*H. Ketcham,* for the appellant.

*S. Sherwood,* for the respondent.

The following opinions were delivered :

By Mr. Justice Cowen. The *codicil* brought the will confessedly within the operation of the revised statutes, which transferred into the possession of both the sons and daughters all the uses and trusts devised to the executors    The executors took no legal estate.  1. R. S. 727, § 47.

The power of appointment by *devise,* and of *leasing for years,* are the only other parts of the will at all effected by the revised statutes ; to what extent, I proceed to inquire.

The power of appointment was rendered void as to estates for life, to be devised to objects of the power *not living* at the time of the testator's decease, but not so as to those who were then *in esse;* and it may still be effectual to pass a fee to either.  § 17 and 129.  Suppose here had been a direct limitation to a son for life, remainder to and among his children as tenants in common, viz. as to those living at the testator's death, for life, remainder to the children of each in fee ; and as to those born after the testator's death, in fee ; the first would be valid within the 17th section, and no doubt the second would be good, which is for a single life in being, directly followed by a contingent remainder in fee.  Alienation is here suspended for only one life in being.  In the former case there would have been but two successive lives in being, followed by a similar remainder.  There is no doubt that two successive lives may so run for each share in common to each child.  Now the power given, I admit, if it should be executed by the grantees in its utmost verbal latitude and in its broadest construction, might attempt to give a life estate to a child or nephew or niece born *after* the death of the testator ; but for aught we know, none has been or will be born after his death ; and if there should be, it does not necessarily follow that the grantees of the power will try to abuse it.  Should they do so, the law will frustrate the attempt ; and I should

suppose we ought rather to intend that the power will be executed within due limits. I do not understand the statute to declare a trust power to be absolutely void, because it is so framed as, in one view, to authorize an appointment of an estate such as the will could not create, provided that in another view it can create estates within reach of the original devise. In estimating the suspension of alienation, you must, to be sure, date from the will. § 128. You are then to look at the estate actually created by the power. I that does not exceed the legal limit of suspense, counting from the time of the testator's death, all is well. The 129th section is, that "no estate or interest can be given or limited to any person by an instrument in execution of a power, which such person would not have been capable of taking under the instrument by which the power is granted." We are, therefore, to look within the compass of the power, which may easily be confined to lives in being, or even brought down to a simple fee in all the appointees. It will be time enough to look to the execution of this power, and nullify that, when we see the appointment of a life estate to a relative who was unborn when the testator died, or other estate created beyond the legal scope of the power. So far we have been speaking of the *power to devise,* which is not beneficial but in trust. That comes under the 129th section alone in regard to its extent and validity. And so, I should suppose, in respect to the *term for years,* were it not for § 92. A lease, though bad for 63 years, would be good for 21 years within the statute, and might avail for that time if expressly so limited, § 87 ; but § 92 declares that no *beneficial power,* other than such as is enumerated and defined by the statute, shall be valid. It appears to me, therefore, that the leasing power for years is destroyed by the statute. The power to demise *for the life of the devisee* is inherent in his estate; and the daughters also can lease for that time, those who are married by joining with their husbands. Looking at the operation of this will under the revised statutes, I see the life estates clearly vested in the proportions of $\frac{5}{42}$ parts to each of the sons and $\frac{4}{42}$ parts to each of the daughters, and subject to the power of appoint-

ment by will, but without any power of leasing for years or lives, a remainder in fee is limited, first to the lineal descendants of sons and daughters, and in default of these to the testator's right heirs.

According to the above view, all those independent parts of the will which are allowed aud declared to be available by the statute are saved; and those other independent parts which are avoided by the statute are avoided according to the case of *Doe ex dem. Thompson* v. *Pitcher*, 2 Marsh. 61; 6 Taunt. 369, S. C. In doing so, courts are acting according to what I understand to be the settled rule of the common and statute law in respect to estates created by will or by deed. Estates or powers which are valid we have no authority to divest or change in any way, unless it be to execute some general intent of the testator apparent on the face of his will. This cannot be done without the modification of some particular limitation or condition void in itself, by giving such an effect as to reach as near as may be such general intent. The usual case is a limitation to a living son for life and his eldest son yet unborn for life, and as to his unborn son for life, and if he die without issue, then over for lives in the same way. Such a limitation is void at common law, as it seeks to suspend its power of alienation for more than a life or lives in being; and the course of the English courts is to declare these void limitations to the unborn son and grandson simply an estate tail in the living son. That carries it to his issue, and takes off the ban of perpetuity by enabling him to alien, and at the same time it comes near to the testator's general intent, which was that the estate should go to the liheal descendants of the living son. The rule is quite artificial, and rather difficult to handle. But it is altogether different, and in truth a refined exception to one branch of the general and almost universal rule, that the instrument shall be saved as far as it is operative and allowed by law, and rejected in those parts wherein it is void. As to the latter part it is nothing; it is no will. As to other parts, courts have no discretion; they must give it effect. In general, they are as strongly bound to repudiate

the void part. If that is to be saved, it is by moulding it into a shape in which the law can know it and take hold of and sustain it. Our new statute requiring us to look to the party's intent and give it effect as far as it is consistent with legal rules, 1 R. S. 748, § 2, is an exact iteration of what the common law had told us more intelligibly, because it gave us illustrations of the rule. In the common case of an estate for life or in fee, with an executory devise on an indefinite failure of issue, it would have been thought strange for a court to have rejected the first estate, because the limitation over was void. No; the courts have always saved such estates as are well limited. A man devised to his eldest son in fee, and on his dying without heirs, then to his eldest daughter in fee. The whole estate passed absolutely by the first devise to the son; and the devise over failed, although a main intent of the devisor was defeated. 3 Leon. 111; *Tilbury* v. *Barbut,* 3 Atk. 617. It would have been the same though the first devise had been to a stranger, and the last to his own children. The stranger might immediately alien, and the whole estate would pass unconditionally out of the devisor's family. Herein courts have no discretion. They cannot bring back the estate on the strongest expression of intent, by declaring the will to be void. A man has an estate for the term of sixty-three years, and he devises it in fee. Although the devise is void for the fee, yet it will carry the whole interest in the chattel real. Suppose the testator, Mr. Stuyvesant, had bequeathed all his silver plate to his eldest son, as he would a farm, to hold to him, his heirs and assigns for ever. This would pass nothing to the *heirs;* but the plate would go to the son's *executors.* In other words, the will is void as a devise, but good as an absolute bequest of the plate. The common law rule sometimes comes in another form: if an instrument cannot enure in one way, or as one thing to pass an estate, it shall in another way or as another thing. In this sense, we have seen that a deed in fee may enure as the assignment of a lease; and a devise in fee as the bequest of a chattel. So in the devise of a future contingent estate, the common law would try in the first place to find

ALBANY,
Dec. 1836.

Salmon
v.
Stuyvesant.

some particular precedent estate of freehold, with which to connect it, and thus make it out to be a contingent remainder ; but on failing in the search, it was suffered to enure as an executory devise. In the present case, all the direct limitations are valid. One of the powers is valid. It has so happened that a mere collateral beneficial power is void—no part of the estate—but a power to make an estate for three lives or sixty-three years. What have we left ? In the first place we have a perfect devise for the life of the first takers. Yet the decree holds that this is void, and that the land descends in fee ; though, so far, I admit the decree comes to the same thing in effect and for the purposes of this cause, as if it had adopted the estate for life. The devise of the special power in trust is then cut off; a power expressly authorized by the statute, 1 R. S. 732, § 78, a proper execution of which would change the destination of the whole estate. Then the remainders, both special and general, first to the lineal descendants of the tenants for life, and on their failure, over to the testator's general heirs. It is true these are contingent ; but they must vest in fee at the termination of a single life or two successive lives in being; and now, since the beneficial power to make estates for three lives or sixty-three years is gone, the fee must at all events vest *in possession* on such determination. Can it be, that because a collateral power has failed, therefore the whole estates must go ? Suppose the power had been to make a term of twenty-one years and one day—a power, it is said, which would be worth nothing for building purposes in the city of New York—it would then be perfectly immaterial whether it were retained or not. It fails under the 92d section, because of the excess of one day. This, too, would be the failure of a collateral power. But it would work no material change. It was worth nothing as it stood ; it is the same now it is gone. Shall we look out of the will, and into the world of speculation, and fix a marketable construction upon legal instruments ? That seems to have been sought for in this case, by both parties.

I must say, that this bill presents us with a head of equity which is altogether unprecedented. The complainant, one

of the sons, complains that the leasing power of sixty-three years was destroyed by the revised statutes; and this being the fundamental part of the will, upon which its details are framed, and without which the intentions of the testator cannot be carried into effect, and upon which the *value* of the estate rested, "your orator is advised that all the provisions of the will and codicil are void;" and the estate descends. The bill then reposes itself upon the facts, that the estate lies in building lots near the compact part of the city, and capable of immediate sale, if an absolute estate can be got up; that great expense must be incurred in grading and paving, in constructing drains and sewers, and forming public squares, and generally in putting it in a proper condition for market; that the testator had, before his death, sold some lots, and taken covenants as to the manner of building on these, and had given covenants as to buildings on some corresponding lots which he retained, which covenants cannot be performed by the heirs, that is to say, they cannot afford to perform those covenants, *if the estate is not vested in the heirs in fee simple;* that heavy assessments, "as your orator believes," are about to be made for city improvements already projected in that quarter; and $3500 have already been assessed upon only eight lots around Tompkins' square; that the *peculiar circumstances of the estate afford conclusive evidence, that if the testator had been apprized that the revised statutes had cut down the leasing power from sixty-three to twenty-one years, he would himself have annulled the will; and either have devised the land in fee, or suffered it to descend.* The bill also states that the executors had made the allotment into forty-two parts. The complainant, therefore, prays that the defendant, who had contracted to purchase No. 330, a part of the $\frac{5}{42}$ in fee, may be compelled specifically to perform. The defendant is extremely anxious to obtain a good title to the lot. He admits all the facts in the bill; but insists that a fee did not pass to the complainant either by descent or devise; and that he, therefore, cannot give a good title. On looking through that part of the bill to which I have just referred, I was led directly to

the end in search for the prayer. It is simply for specific performance, and for further and other relief. The pleader did not frame a special prayer covering the leading article of relief. He had a right to repose on the general prayer; but a special one would have afforded a better test of his title to relief. It would have run thus: " Your orator, therefore, humbly prays your honor, in a view to the great difficulty upon the title allowed to your orator by the revised statutes under this will, in disposing of city lots, that your honor would blot out the trust power, and dock the contingent remainders, thereby cutting off all right which the testor has secured to the more remote branches of his family; that your honor would repeal the revised statutes *quoad hoc;* and enlarge the life estate of your orator to an estate in fee, provided always, that the said devise and the said revised statutes shall still be left *so far to operate* as to secure to your orator and his brethren the preference in the quantity of $\frac{1}{42}$ over their sisters, and your orator as in duty bound will ever pray." It is often very profitable to have a case plainly stated. All this prayer is founded on the notion that had *the testator lived to the day of city improvement and specu-lation,* he would have preferred to see his large landed property in the market, for the absolute benefit of those to whom he had limited life estates, and encouraged to build up a princely remainder, not for themselves, but one which should go and be distributed among the more remote branches of his ancient family. That rests on the assumption essential in the chain of reasoning, that he did not understand the revised statutes, under which he was making his will. All this is gravely stated in the bill, and admitted in the answer; and the suit was very amicably conducted up to, and including the hour of the argument. The appeal goes in form to the whole decree, and we were slightly requested to consider the case co-extensively with the appeal. But the point of construction, upon this will in favor of a fee was so cogent, that the purchaser himself is finally overcome by it, and the only stand made by him is in behalf of the daughters of the testator. The appellant insists that, to be consistent, the chancellor should have said, when the

land descended, it went down entirely clear of the will; whereas he retains and gives the will operation for the purposes of apportionment. For my own part I know of no rule on this head, except the one which I have mentioned. I have no doubt that the land is properly apportioned under the authority conferred upon the executors; for though the devise to them is void as an express trust, it is saved by the statute, and made to enure as the appointment of a trust power. 1 R. S. 729, § 58. But I go farther, and differ from the chancellor, because I think the will should be saved in all its operative clauses.

On the whole, I cannot consent to participate in the endorsement of this title. I am not willing to act upon any one consideration stated in the bill; the interest of the heirs, the interest of the city, the fancied mistake of the law into which the testator may have fallen, the removal of obstacles in the improvement of this property, or the imagining that had the testator been well advised, he would have destroyed his will and devised in fee or suffered his land to descend. I can no more consent to the nullification of a legal operative will, on the ground that it brings the affairs of the estate into a supposed unfavorable posture, than I can join in rectifying a bargain which turns out to be unfavorable to the party. I will not undertake to be more sagacious than the testator in framing a devise. In short, I will not go out of the will itself and pry into the affairs of the estate or the situation of the family, in order to fix a construction upon parts which are plainly expressed and as plainly legal and valid. How am I to know that this testator did not mean to withhold the power of leasing? Am I to infer it, because these parties have chosen to say that the city is encroaching on his grounds, and he thought proper to sell a few lots, and covenanted to build on others? I deny, that because he did so, I am to infer that he intended *others* should lease. The inference is equally strong, for aught we can know, that he intended, as he has done, to keep the estate as long as the law would allow in his own family; and if this bill and answer had gone into the history of the family, and of the land itself, which is said to have descended lineally from Governor

Stuyvesant, we might very easily have seen that not illaudable pride of ancestry, still exhibited in the person of this testator, which has for so many ages kept his patrician estate together. Upon the principles of this bill there is no limit to construction. We might as well undertake to re-model a will on principles of family pride or family affection, or any other motive, which we may choose to imagine as likely to govern the testator, and say, had it not been for a misapprehension of the purport of the revised statutes, he would have devised so and so. I confess I had always supposed that parties should be taken to know the law which governs their wills and their contracts. As a judge, I have always felt bound to act on that presumption as conclusive, even in the law of crime; and in my progress I have felt more and more confirmed, that it is the only practicable and safe presumption, in all legal transactions. When you depart from it, you launch into a sea of dreams. It is so in relation to every cardinal rule of construction. No man knows, when he sits down to write a contract or to write his will, but that at the next law or chancery term, under the revised statutes concerning *intent*, he may be stultified in respect to a matter concerning which he knew more and was better qualified to speak, and did speak better than all the world beside. Judging from what we have heard and felt, in the course of this term, I am sure, if we impose an understanding of our new statutes in this branch of the law, upon any one, as a condition to the making of a will, very few will succeed; and if we undertake to make new wills for every partial failure, while we embark in an interminable labor, I still fear we shall not be better testators than those who were more lawfully employed in disposing of their own estates.

The case of *Lorillard* is relied upon by the appellant, as in principle overturning the whole of this will. The rule of that case was said to be, that a failure in part is fatal to the entire instrument; that the intent of the testator, the soul of the will, is indivisible; that the whole must be effectuated, or its identity is lost, and it can no longer be known and traced by the law. That case holds no such doctrine. Such a

decision, in that or any other cause, by this court, would operate as a sentence of nullity against the more important class of wills. No will of any considerable estate, embracing various kinds of property and seeking to provide for a numerous family by the bestowment of different interests, could ever stand the test of such a principle. Some slight mistake of testamentary power, some uncertainty of expression, some lapse of ademption, or one of the thousand occurrences which baffle human wisdom and forecast, always has arisen and always will arise to prevent the exact fulfilment of all the testator's purposes.

On the whole, if we agree with the chancellor, that the will is to be retained so far as it creates a trust power of apportionment, I am unable to see any reason for denying its operation as to other provisions equally valid ; and on the other hand, if we hold with the chancellor that the land goes to the heirs by operation of law, it seems to me the very principle which gives it that direction, withdraws the will altogether, and leaves the statute of descents to perform its office. Although the appellant's points presented this alternative view of the case, yet the counsel on both sides agreed on the argument that the land descended. In either view, the respondent is unable to make such a title as he contracted to convey. The decree for a specific performance was, therefore, erroneous, and should be reversed.

By Mr. Justice BRONSON. I concur in the result of the opinion just delivered, that the decreee of the court of chancery should be reversed ; but I do not deem it either necessary or expedient at this time to pass upon the validity of the will. If the statute has interfered so far with the intent of the testator, that his children are entitled to the estate as heirs at law, they must take in that capacity throughout. They cannot take as heirs against the will, and in unequal portions under the will. We need go no further to dispose of this case, for whether the will is valid or not, the respondent is unable to make a good title. If the will stands, he has only a life estate ; if it falls, he and the other sons must

ALBANY,
Dec. 1836.

Salmon
v.
Stuyvesant.

take in equal portions with the daughters. The partition and releases have not been made upon this principle.

This is an amicable suit. Both parties agree that the devise is invalid, and they only differ as to the proper division between the sons and daughters of the testator. I think it inexpedient to pass on the validity of the will, because we have only heard one side of the question, and the persons interested beyond the life estates are not before the court.

Chief Justice NELSON concurred in the views expressed by Mr. Justice BRONSON, and in the disposition recommended by him to be made of this case.

Whereupon the decree of the chancellor was unanimously reversed, and the following decree entered:

" It is ordered, adjudged and decreed, that the respondent either took a *life estate* under the will in five undivided forty-second parts of the real estate of the testator, *or* he, together with the other sons and the daughters of the testator, took the said real estate as *heirs at law* in *equal shares;* and in either case the respondent cannot make a good title in fee simple to the lot, piece or parcel of land mentioned in the pleadings in this cause. It is therefore further ordered, adjudged and decreed, that the decree of the court of chancery made in this cause be reversed and annulled," &c.