Root v. Stuyvesant.

---

### ROOT, *appellant*, and STUYVESANT, *respondent*.

Where a testator, by will made in 1828 and republished in 1833. devised all his real estate to executors, *in trust*, to make partition among his children, and to convey their several proportions to each for and during his *natural life*, with power to make leases for a *life or lives in being* or for a *term of sixty-three years*, and by last will and testament to devise and *appoint* the land conveyed to him, to or in trust for any one or more of his children, grand-children, nephews and nieces, for such estates and subject to such powers as he should think fit; and for want of such appointment, the land to go to the children of the son dying without making such appointment; and if he left no child or grand-child, then to the right heirs of the testator; IT WAS HELD by the *Chancellor*, inasmuch as by the republication of the will after the Revised Statutes went into operation, the power to execute leases for the period of *sixty-three years,* was reduced to the execution of leases for only *twenty-one years;* but in view of the *peculiar situation of the property devised,* the carrying of the will into effect according to its terms, *would defeat the principal intent of the testator,* and that therefore it ought to be declared *void,* except as to the direction of the proportions in which the children should take, and the power of partition given to the executors; and he accordingly decreed that the children of the testator should take the property as *heirs at law* with the exceptions above stated, and declared the powers in trust to *appoint the remainders* and also the *limitations over* void. On appeal, this decision was *affirmed* in the court for the correction of errors, by a vote of *twenty-five* members of that court; *seven* only dissenting.

The dissentients were, the PRESIDENT of the Senate, *Chief Justice* NELSON, *Justices* BRONSON and COWEN, and *Senators* LAWYER, TRACY, and WAGER. The judges of the supreme court delivered opinions *seriatim,* for a *reversal* of the decree of the chancellor, in which they held: 1. That under the operation of the Revised Statutes, the children of the testator took the real estate, and held it, as of the same quality and duration, and subject to the same conditions, as their beneficial interests; the *executors* retaining the power to execute the will. 2. That the remainders over, and the *power of appointment,* were good and valid; and that the latter [258] were so, notwithstanding the generality of the terms conferring the right to create *successive estates* for life in persons not *in esse;* the legal presumption being that the donee of the power will execute the same in *conformity to,* and not *in violation of,* the rules of law. 3. That notwithstanding the statutory prohibition, the *power to lease* was good, inasmuch as it might be executed within the statutory limits, and that an *illegal execution* would not be presumed, and that even such an execution would be void only for the *excess.* 4. That the power to lease is invalid *only,* when in its creation it is *required* to be executed in a mode prohibited by law, *and not otherwise.* 5. The failure of the intent of the testator, that his *children* should have *life estates,* with the *power of leasing* for sixty-three years, is not enough to justify the avoiding of the whole will, and permitting the children to take as heirs at law, where it is manifest that the testator intended that the *fee* should not go to his children, but to their posterity, although the power of leasing for the term expressed in the will is destroyed by the operation of a statute passed after making the will, and the life estates with the power of leasing only for the term allowed by law are greatly reduced in value or even rendered worthless. 6. Where the language of a will is plain and unambiguous, matter *dehors* the will cannot be resorted to in settling its construction; nor can the *ignorance* or *mistake of law* of the testator in reference to the statute of wills, be taken into consideration; nor can a *void clause* in a will be invoked as evidence of the intention of the testator in respect to other clauses—being void, it must be disregarded for all purposes; *per Cowen, J.*

APPEAL from chancery. In October, 1828, the father of the respondent made and published his last will and testament, whereby, after disposing of his plate, family pictures, &c., he gave to his executors all his personal estate *in trust* to pay to his wife an annuity of $3000; and, after paying the said annuity, to divide the surplus *yearly income of his personal estate* among all his children,

Root *v.* Stuyvesant.

until four years after the youngest of them should arrive at lawful age, and then to divide among them the *principal*, reserving enough to secure the annuity to his wife, and after her decease, to divide the portion reserved to secure the annuity. He also devised *all his real estate* to the executors *in trust*, to make partition of the same into *nine shares*: that is to say, *six shares each of five undivided forty-second parts*, the whole into 42 equal parts to be divided, and *three shares each* of four undivided forty-second parts; and to convey one of the shares of $\frac{5}{42}$ parts to the use of *each* of his *six sons*, (of whom the respondent was one,) for and *during his natural life*, with power to lease, devise and appoint the same, as follows: to make leases for life or lives, or terms of years of all or any part of his share, so that every such lease should take effect in [259] possession, and should not be for a longer period than a life or lives in being at the time of the making thereof. or for a longer term than sixty-three years; and the testator further empowered each of his sons, by his last will and testament, to devise and appoint the land conveyed to him for life, to or in trust for any one or more of his children, grand-children, nephews and nieces, for such estates and subject to such powers as he should think fit; and for want of such appointment, that the land should go to the children of such son, and to the children of any child of such son who might have died before him, and their heirs, as tenants in common: the child or children of a deceased child of such son to take such share as his, her, or their parent, if living, would have been entitled unto; and if such son should die, leaving no child or grand-child him surviving, then for want of such appointment, the real estate to go to the testator's right heirs. In respect to the *daughters*, he directed the executors to convey *one share of four forty-second parts* to such trustees as should be named by *each* of his daughters *in trust, to allow such daughter to receive the rents and profits thereof* during her natural life; and then conferred the same powers upon the *daughters* which he had conferred upon the *sons*, to make leases and appoint by will how her share should go after her death. In February, 1833, the testator made a *codicil* to his will, in which, after adding three to the number of his executors, and giving direction in reference to payments made, and responsibilities assumed by him for his sons-in-law, he *republished* his will made in October, 1828.

The respondent filed a bill in chancery against the appellant, praying a decree for a specific performance of a contract. After setting forth the will and codicil, he alleged that *partition* had been made of the real estate whereof his father died seized, *according to the shares as directed by the will;* that a certain house lot, in the city of New-York, had fallen to his share, and had been conveyed to him, in pursuance of such partition, and also that the said lot had been released to him *in fee* by his brothers and sisters, and that the dower of his mother and of a sister-in-law had also been released and conveyed to him in due form of [260] law; that on the 15th of October, 1836, a contract was entered into between him and the appellant, whereby he agreed to convey the lot in question to the appellant for the sum of $4500; and that subsequently the appellant had given him notice that he would not accept a deed of the lot, or pay the money, as he had been advised that the respondent could not convey to him a title to the lot in fee simple absolute. The respondent then stated that he had been advised that the will and codicil must be interpreted and governed by the Revised Statutes of the state, which rendered *void* the provision giving the power to lease the estate for 63 years, and that consequently *the whole will is void* as it respects the real estate, and that it descends to the *heirs at law* of the testator; or if the will is to be deemed valid, that it is to be esteemed a devise by the testator to his children *in fee* simple. He stated the peculiar circumstances of the property whereof the testator died seized, and averred that if the estate was not vested in the heirs in fee simple, and the power of leasing was shortened from 63 to 21 years, great injury would ensue to the heirs; and that it was manifest if the testator had been apprised that such would have been the operation of the Revised

Root v. Stuyvesant.

Statutes, he would have *annulled* the will. He insists, that either on the ground of the invalidity of the will, or if the will is to be deemed valid as a devise, then that by a true interpretation thereof, the estate is devised *in fee* to the heirs of the testator, and thus he, the respondent, has a perfect title to the lot in question; wherefore he prays that the appellant may be decreed specifically to perform the agreement by paying the money, &c.

The appellant in his answer insists that the will is void only so far forth as it respects the provisions giving power to lease for a term exceeding 21 years, and that under it an estate in fee simple did not pass to the children of the testator; and that therefore the respondent has not the title, and cannot convey the lot in fee simple.

The cause was brought to a hearing upon the bill and answer before the chancellor, who *decreed* that the power contained in the will of the testator, authorizing his sons and daughters to devise and appoint their respective shares to [261] or in trust for their children, &c., for such estates, &c., as they should think fit, is illegal and void, and that the limitation over of the ultimate remainder is also void, and that consequently the real estate of the testator upon his death, descended to his heirs at law. The chancellor, however, further decreed, inasmuch as it appeared that full releases of the lot in question had been executed to the complainant by all his surviving brothers and sisters, and that the dower of his mother and of a sister-in-law had been extinguished by release, that the complainant had the right and power to convey to the defendant an absolute estate of inheritance in fee simple in the lot in question, and directed the defendant *specifically* to perform the agreement.

The following opinion was delivered by the chancellor on the making of this decree:

*By the* CHANCELLOR. This is a bill for a specific performance of an agreement for the sale of one of the lots belonging to the Nicholas William Stuyvesant estate. The contract was made after the decision of this court in the case of *Stuyvesant* v. *Salmon*, in July last, and presents substantially the same facts, except that all the children and heirs of the testator have joined in a release of this lot to the complainant. But in consequence of the doubt expressed by some of the members of the court for the correction of errors, when that case came before them, since the making of the contract for this lot, the defendant refuses to take the title. It is, therefore, I presume, not very material how the question is decided here, as neither party will rest satisfied with my decision. But I have, as yet, seen nothing to induce me to believe the testator intended to leave his children penniless, for the purpose of giving an estate worth a million of dollars, if it was in a situation to be used for any beneficial purpose at this time, to unborn generations. The circumstances of the case show that it was impossible, if he was in the possession of his senses, that he could have understood the provisions of the Revised Statutes as applicable to this will, and it is therefore impossible to give any effect to the limitations over, without entirely defeating his [262] intention to give a present and beneficial interest to his children. In conformity with the decision which was made in that case, and upon the ground that a will should not be carried into effect, which, it is evident, must defeat the intention of the testator, which is the pole-star to guide the decision of courts upon the construction and legal effect of a will, I must therefore declare that, under the releases which have been given by the children and heirs, this complainant has an absolute estate in fee to the lot in question, and can give a good and valid title to the defendant, and the complainant is entitled to a decree for the specific performance of the contract made with the defendant, according to the terms of that agreement.

Although the court of dernier resort disposed of that case upon a question which was not argued or suggested before the court below, and very properly refused to decide the main question, because the counsel thought proper to aban-

Root v. Stuyvesant.

don it in the argument in the appellate court, the fact that a doubt was thrown upon the title by the course the cause took there, and by the opinion expressed by one of the judges, is sufficient excuse to the defendant for wishing to put this case in a situation where he might obtain a decision of the court of dernier resort upon the validity of his title, I shall not therefore charge him with the costs of the present suit. But I must take the title, and pay the four thousand five hundred dollars which he has agreed to pay for the lot, as the decision of this court is, that the complainant's title to this lot is perfect, so that his conveyance will vest the defendant with the fee. For the reasons upon which this decision is founded, I refer to my opinion in the case of *Stuyvesant* v. *Salmon*, before mentioned. Which opinion was as follows :

" The object of this suit is to compel the specific performance of an agreement for the sale of a vacant lot in the city of New-York ; and the only question presented for the consideration of the court, is, whether the complainant is the absolute owner of the fee, so as to be capable of conveying to the defendant a perfect title to the premises. The lot in question is a part of a tract of land in the city of New-York, consisting of about six hundred vacant building lots, and a few lots on which buildings had been erected, which belonged [263] to Nicholas William Stuyvesant, who died seized thereof, in February, 1833. He made his will in October, 1828, and if the provisions of the will could have been carried into effect according to the law as it then existed, his children, who were the principal objects of his bounty, would have taken a valuable beneficial interest in his real estate for life, with a power of appointment by will of the ultimate remainder among their children and descendants and other near relatives. But as the testator survived until after the Revised Statutes went into operation, and republished his will after that time, by making a very slight alteration by way of codicil in 1833, it has now become impossible to carry the provisions of the will into effect, except in one particular, without defeating the obvious intentions of the testator at the time the will was made. The property was of such a nature that it was only valuable for building lots, and the taxes and assessments to which it would be subject in a part of the city which was rapidly improving, would be at least equal to the amount for which it could be rented for any other purpose. The testator had also sold a portion of his building lots, and by the terms of sale the purchasers were required to erect valuable buildings thereon, of a particular description, and he had covenanted, on his part, that whenever buildings should be erected on his adjacent lots, they should be buildings of a similar description, such as no mere tenant for life would think of erecting on property held by such a tenure merely. Hence the necessity of giving to the children of the testator the power to make leases for several lives in being, or for long terms of years, to enable them to get any reasonable rent for the premises. But as a tenant for life cannot, under the provisions of the Revised Statutes, be empowered to make leases for a life or lives of any persons, except his own, or for a term exceeding twenty-one years, a life estate in this particular property is of no value to those who were the principal objects of the testator's bounty. (*See* 1 R. S. 733, § 87, 92.) The power contained in the will to make leases for any number of lives in being at the time of making such leases, or for long terms not exceeding sixty-three years, and which power would have been valid as [264] the law stood in 1828, when the will was made, was all that was requisite to enable the tenants for life to lease the premises for fair and reasonable rents, to those who could upon such leases afford to erect such buildings as were required by the testator's covenants. But if the testator could have known the operation of his will, under the provisions of the Revised Statutes relative to powers, was to deprive his children of all beneficial interest in his estate, and to tie it up for the sole benefit of another generation, it is very evident that he would have given the fee to his children, or have devised to them an absolute term of sixty-three years. The other objects of the testator in making this will,

Root v. Stuyvesant.

except as to the unequal portion which he intended to give to the sons and daughters under the power in trust to the executors to make partition, are also defeated by the operation of the Revised Statutes.  His object was to create a valid trust as to the shares belonging to his daughters, so as to enable the daughters to receive the rents and profits for life, free from the control of their husbands, and with power to dispose of the estate by will at their deaths.  But the trust which is created by this will, is such an one as is turned into a legal estate in the daughters by the operation of the 47th section of the article of the Revised Statutes relative to uses and trusts, (1 R. S. 727,) as it is in terms a trust to allow the daughters themselves to lease their respective shares of the premises, and to take the rents and profits thereof from the tenants, and not a trust for the trustees to receive the rents and profits for the use of the *femes covertes*, and make leases of the premises, within the intent and meaning of the 55th section of the same article of the Revised Statutes.  The testator also intended to give to his sons and daughters respectively, a power in trust, by will, to dispose of estates for life or other estates in remainder less than the fee, and if the whole fee was not disposed of to the first appointee, that the ultimate remainder should go to the child or grand-child as a contingent remainder limited on such previous estate. [265] But by such, the 17th section of the article of the Revised Statutes, relative to the creation and division of estates, (1 R. S. 723,) successive estates for life cannot be limited to persons not in being at the creation thereof, and a testator cannot authorize the creation of an estate under a power which it would not have been lawful for him to create by a direct devise. The power in trust to the tenants for life contained in this will, to devise and appoint their respective shares after the termination of their life estates therein, to, or in trust for, their children, grand-children, nephews and nieces, for such estate or estates, and subject to such powers and provisoes as they shall think fit, is therefore illegal and void.

" It is the duty of the court, however, to carry the will into effect, so far as it is legal and consistent with the intention of the testator, (1 R. S. 748, § 2,) and it is evident that the testator intended to give to the daughters, shares in the estate which should only be four-fifths as large as those of the sons.  He also intended that the estate should be partitioned among the sons and daughters by the executors of the will, in those proportions.  This part of the will is valid, and must be carried into effect, unless the heirs at law have otherwise agreed among themselves.  I shall, therefore, declare and decree, that the six sons respectively, took, under the will of the testator, an absolute estate in fee, of five forty-second parts of the testator's real property, and that the three daughters took a like absolute estate in their four forty-second parts respectively ; that the several powers in trust to appoint the remainder, and also the limitations over of the ultimate fee, are void; that upon the death of Robert Reade Stuyvesant, intestate and without issue, the whole of his share descended to his surviving brothers and sisters, in equal proportions, subject to the right of dower of his widow therein ; and that the complainant can therefore convey an absolute and perfect title in fee to the defendant in the lot No. 330, in the pleadings of this cause mentioned. A specific performance of the agreement for the sale and purchase of that lot, must therefore be decreed.  But under the circumstances of this case, I shall not charge the defendant with costs, he having had probable grounds [266] for contesting the complainant's title to the lot, and for insisting upon the validity of the will.

From the decree thus made in the cause of Stuyvesant against Root, the defendant appealed to this court, where the cause was submitted on printed arguments, by

J. Anthon & T. Fessenden, for the appellant.

S. Sherwood & S. Beardsley, (attorney-general,) for the respondent.

S. A. Foote, for S. V. S. Wilder, a purchaser under the respondent.

Root v. Stuyvesant.

After advisement, the following opinions were delivered :

By Chief Justice NELSON.   This case involves the question, whether the will of the late Nicholas W. Stuyvesant, made in October, 1828, but republished, with some slight alterations, in February, 1833, is valid within the provisions of the Revised Statutes.   The chancellor has come to the conclusion that it is not valid ; that so much of it is void within these statutes, that the residue cannot be upheld without altogether defeating the testator's intention, and depriving the children, the chief objects of the testator's bounty, as supposed, of any beneficial interest under it.   He therefore concluded the real estate had descended to the heirs at law, and that they were capable of conveying the fee to a purchaser.

It must be conceded that the executors did not take the legal estate, as the trust could not uphold the devise of it to them within the statutes, (1 R. S. 728, § 55, 16 Wendell, 114, 115,) which transferred the uses and trusts for the benefit of both sons and daughters into possession, who took the legal estate of the same quality and duration, and subject to the same conditions as the beneficial interest intended to be given.   (1 R. S. 727, § 47.)   This operation of the statute upon the will, however, may be said to be nominal, because the trust therein created is not inoperative ; it may be executed as a *power*, according [267] to the express provisions of the statutes.   (1 R. S. 729, § 58, and 732, § 77, 78.)   *Partition* may be made and *conveyances* executed in strict accordance with the directions of the testator by the executors, with the same effect as if they took the legal estate.   The only difference is, that now they act simply under a naked power, instead of a power coupled with an interest.   There is nothing, therefore, in this view essentially interfering with the will.   The *life estates* may be conveyed, and the life tenants vested with the power of *leasing* and of *appointment*.

*As to estates in remainder to the grand-children, subject to the power of appointment by the life tenants.*   These are no doubt valid, whether regarded as vested or contingent remainders.   Laying out of view the power of appointment, the devise is a common and simple family settlement : the testator giving to his nine children separate portions of his real estate for life, remainder to their children in fee, regarding grand-children as representing a deceased child, and if none, then over to the testator's right heirs.   It is obvious that these remainders must vest in possession at the termination of a life—the life of each of the nine life tenants respectively.   On the decease of one, the estate passes directly to the children or lineal descendants absolutely ; if none, then to the right heirs.   In no event can the power of alienation be suspended beyond one life ; the statute allows it to be for two.   (1 R. S. 723, § 15).   It is also perfectly clear, that the remainder in each case would become vested on the birth of a child, there then being no contingency to happen but the death of the tenant for life, which, as well settled, does not make a remainder depending upon it contingent.   Such vested remainder, however, would be subject to open for the purpose of letting in the after-born children, brothers and sisters, and would also be subject to the power of appointment.   (*Tanner* v. *Livingston*, 12 *Wendell*, 83.   *Fearne*, 227, 233, 313, 314.)   It appears to be well settled, that until the execution of the power, the remainders or limitations over take effect the same as if no such power existed, or as in case of default of execution of it. [268]   (*Cunningham* v. *Moody*, 1 *Vesey*, sen., 174.    *Doe* v. *Martin*, 4 *T. R.* 39.   *Fearne*, 227 to 232.    *Sugden on Powers*, 2, 5.)   The doctrine is very clearly and succinctly stated by *Fearne* ; and *Sugden*, after discussing the cases on the point, observes that the result of the authorities is, that the power of appointment does not prevent the vesting of the estates limited in default of appointment.   They are of course subject to be divested on the execution of the power.

*Next, as to the power of appointment.*   This is also valid, as will be seen upon a brief reference to the authorities.   The only objection that can be started to it is this, that regarding its range and extent, the life tenants might appoint estates

Root v. Stuyvesant.

contrary to law; such as successive estates for life to grand-children, and other persons *not in being* at the creation of the estate, in violation of the 17th §, 1 *R. S.* 723, because the power authorizes each to devise or appoint " to or in trust for any one or more of his children, grand-children, nephews and nieces, *for such estate or estates,* &c., as he shall think fit." There is nothing, therefore, in the terms of the power restraining the appointment to be made under it, to the estates or line of perpetuity prescribed by the Revised Statutes; and hence it is supposed the power itself cannot be upheld. The point is clearly settled otherwise. In *Hockley* v. *Waresbey,* (1 *Vesey, jun.,* 150,) the devise was " to R. R. and his issue lawfully begotten, or to be begotten, to be divided among them as he should think fit; and in case he should die without issue," then over, &c. The validity of the power was not the point in question; but it came up incidentally on an objection that the word *issue* would extend to grand-children, or any other degree of kindred, however remote. The lord chancellor remarked that it would be so, but only in this point of view, as a description of the objects, among whom the power of the son was to obtain, to make such partition as he should think fit; and whosoever they were, they must be in existence during the life of the son, thereby restraining the exercise of the power within the limits prescribed by the general law of the land. In *Routlege* v. *Dorrell,* (2 *Vesey, jr.,* 356,) the devise was [269] to assign or transfer the trust premises, &c., among all the children and grand-children or issue of the intended marriage, &c., in such shares and proportions, and under such restrictions, limitations and conditions, and at such times, &c., as the said Richard and Elizabeth, or the survivor, by deed should appoint. There the power was as broad and unlimited as the one under consideration, but the master of the rolls entertained no doubt that it was competent to the parties to have appointed among all the issue living at the death of either of them, whether in the first, second or third degree; and though the words were not confined to grand-children *living at the death,* yet as they might appoint to such as were then living, such appointment would be good. On this point Mr. *Sugden,* in his valuable *Treatise on Powers,* remarks, that a general power to a person *in esse* to appoint to *children* or *issue,* without expressing the time within which they must be born, is good; for the donee *may* appoint to such issue as are within the line of perpetuity. ( *Vol* 1, *p.* 182, 499.) As a kindred principle to the one we are considering, we may refer to the cases, where it has been repeatedly held that a power of sale and of exchange, not restrained to lives *in being* and twenty-one years afterwards, but general in its terms, is valid; in all these cases, it should be remarked, the sales were actually made in the lifetime of the tenants for life, who were *in esse* at the date of the settlements. ( *Biddle* v. *Perkins,* 4 *Sim.* 135, 138, *n.* 140. 2 *Crompt. & Jer.* v. 334, 339. *Sugden on Powers, vol.* 2, *p.* 495, 496.) If these authorities and principles may be relied on, then it is clear that the only objection that can be made to the power in question, namely, that it does not in terms restrain the appointment of estates under it to those prescribed by law, and therefore may possibly be so executed as to create a perpetuity, is altogether untenable; and that it is enough if the grantee of the power is not *required,* in the execution of it, to make such a limitation. If he may appoint estates that are permitted under the statute within the scope of the power, it will be upheld. The court will not presume an unlawful execution, when it may be executed consistent with the rules of law. In the [270] language of Mr. Sugden, if the power is within the line of perpetuities, that is, if it may be thus executed according to its terms, the line can always be drawn, and there appears to be no reason why it should be deemed void in its creation.

*Next, as to the power to lease, given to the life tenants.* The will in this respect is as follows: " I hereby empower such son to make leases for a life or lives, or terms of years, of all or any part of his share, &c., so that no such lease shall be for a longer period or term than a life or lives in being at the time of the making

Root v. Stuyvesant.

thereof, or for a longer term of years than sixty three-years." The Revised Statutes (1 *R. S.* 733, § 87) only permit a power to be conferred on a tenant for life to lease a term *not exceeding twenty-one years*, and to commence in possession during life. Now the only objection that can be made to this power to lease is exactly the one taken to the power of appointment, namely, that the life tenant may within the range of it make a lease exceeding the twenty-one years; and it is difficult to perceive any reason why it should not be subject to the same rule which controls in the case of the power of appointment. There is nothing im perative upon the life tenant in respect to its execution; the lease may be made for twenty-one years or less, or it may be altogether omitted; and, therefore, there is nothing in the power to preclude the execution precisely according to the statutory limit. If it is to be declared void in its creation, it must be for the reason that the grantee of the power might possibly make a lease exceeding the twenty-one years, that is, for life or lives, or sixty-three years; in other words, might make one not consistent with the rules of law. But we have seen that this affords no ground for declaring it invalid; that the court will not presume an execution contrary to law, when the power does not require it; and that the true test in respect to its validity, is, whether it may be executed within the limits prescribed by the statute, consistent with the terms and import of the power.

The conclusiveness of this view in upholding the *power to lease*, cannot be denied, unless the rule of interpretation has been changed by the 92d § of the article upon powers. (1 *R. S.* 733.) That provides that " no beneficial [271] powers, general or special, hereafter to be created, other than such as are already enumerated and defined in this article, shall be valid." The section asserts only what must have been the necessary construction of the article without it, because the first section abolished all powers as they then existed, and declares that thereafter the creation, construction and execution of them shall be governed by the provisions of the article. The authority, therefore, for upholding this or any other power, must have been found in this article. Even if the 92d §.had been omitted, it neither adds to nor takes from it, but in terms declares what must otherwise have been pronounced by the courts, namely, that a power inconsistent with the law, is void. The principle of the section is not new, but existed before the statute; the only effect of it is, that instead of looking into the common law for the rule to determine whether a power is well granted or not, we must now look into the statute. At common law a power to devise lands so as to tie them up for lives in being and twenty-five years, *and not otherwise*, would have been void in its creation, as tending to a perpetuity, just as a power now would be void under this 92d § to a tenant for life to lease lands for twenty-five years and *not otherwise*. Thus constructed it would be void, because the grantee could not execute it according to its terms, without limiting, in the one case, an illegal estate, and in the other, without making a prohibited lease. No act could be done under it consistent with the rules of law. The power is unlawful through-out its whole scope and extent, tying up the donee to limit the particular estate, or to make a particular lease which the law had condemned. But as we have seen, where the power is general, or to *appoint* estates to children, grand children, or issue, without in terms restraining it within the line of perpetuity, and where apparently an appointment might be made too remote, it is valid, for the reason that the appointment may be made within the proper limit consistent with the power. And upon the same principle and course of reasoning, where a *power to lease* is general, or, which is the same thing, for life or lives, or a term not to exceed 63 years, inasmuch as it may be executed within the legal limit [272] (the 21 years) consistent with the terms of the power, I do not perceive why we are not warranted in holding it valid. Taking up the power and applying the statute, there is no difficulty in harmonizing them. True, if the statute permitted a lease for lives or term of 63 years, the grantee might reach that term; but as twenty-one is the extent, he *may* stop there. The duration of the term is not

Root v. Stuyvesant.

prescribed but left to the judgment of the donee of the power; that must be regulated by the law of the land, and he is bound so to regulate it.

If, then, it be said that the power is not in conformity with any of those enumerated and defined in this article, and therefore invalid, according to the terms of the 92d §, it may be answered, that the proposition assumes what may be denied, to wit, that it is a power to lease for a term exceeding 21 years. If it were so, I admit it would be invalid; but it is not the true construction, according to the cases already referred to; and indeed the principle upon which they were put, repudiates it, because they hold that a general power, though it might be executed so as to exceed the legal limit in a given case, is nevertheless to be deemed a power consistent with the rules of law. In the language of Mr. Sugden, and it is taken from the master of the rolls in *Routlege* v. *Dorrell*, a general power to appoint to children or issue, without expressing the time within which they must be born, is good; for the donee may appoint to such as are within the line of perpetuity. Now if the power there which was general and unlimited to appoint estates to issue, though unborn and however remote, was not considered a power to appoint beyond the limit allowed by law, how can it be said here that a power certainly not more general and unlimited, is one to make leases for terms exceeding 21 years. There the power was deemed to be brought within the proper limit, lives in being and 21 years, by the restraint of the law; and so here, it is brought within the like limit, the 21 years, in the same way. If the one was not a power to appoint estates contrary to law, surely the other cannot be to make leases [273] in violation of the statute. The discretion to be exercise in the execution in the one case is as absolute as in the other; in neither are they *required* to create an illegal estate.

Independently, also, of the authorities upon which the foregoing conclusion rests, it will be found to be sustained by the most solid and satisfactory reasons. A general power, says Mr. Fearne, of appointing an estate or interest *ad libitum*, though enabling the donee to limit the fee, does not ascertain any estate to be limited; therefore no limitation of the fee arises until it be actually appointed under the power. The appointment, when executed, may not reach the fee; it may stop at an estate for years, for life, or in tail; and until the appointment be complete, the power amounts no more to a limitation of the fee, than it does of an estate tail or any other ascertainable interest, equally within the extent of the power, but in which the execution of it may terminate without limiting the whole fee. (*P.* 230.) Now, reasoning upon the terms of the present power in this way, it must be said it ascertains no particular estate to be limited; no lease for life or lives, or for sixty-three years; it may be for twenty-one years or less; and until actually executed, the power amounts no more to a limitation of a lease for life or lives, or sixty-three years, than for the twenty-one or less; or, in the language of Mr. Fearne, to any other ascertainable interest within the extent of the power. While, therefore, it continues merely potential, we are not at liberty to say, that it is a power to make leases beyond the limit of the law; because we see from the interpretation of the courts, it may with equal propriety be considered a power within that limit. Whether within or beyond, is controlled by the execution; if the lease is made *within*, it is valid, if *beyond* it is invalid, as to the excess, and nothing more. This has been repeatedly decided, as in *Campbell* v. *Leach*, (*Amb.* 740,) where, under a power of leasing for twenty-one years, a lease of twenty-six years was granted, and held void only for the excess. (2 *Ves. sen.* 644; 3 *Ch. R.* 610; 2 *Sugden on Powers*, 81.) Again: the principle which must be estab-[274] lished upon invalidating this power, appears to me to be most unsound and mischievous in its operation. It is this, that the possibility of the abuse of an authority, is enough to dissuade the court from upholding it. This is the utmost that can be urged against it, as it cannot be denied but that the life tenant may make leases for twenty-one years or under; that all the force of the law comes in to restrain him to such an execution, and that if presumption is to be in-

146

Root v. Stuyvesant.

dulged, it is in favor of it.  The more sensible and practicable principle is, the one for which I contend: that where the power is general, as a power of sale and exchange not confined to be exercised within the line of perpetuity; or a power to appoint to issue, without expressing the time within which to be born, as it may in either case be executed within the legal limit, the court will consider it thus confined, and though general in terms, being subject to the operation of the law, it will be regarded simply as a power to make such sales or appointments within the scope of it as may be valid; a construction which, when applied to the case under review, will restrain the power to lease to twenty-one years or under, and thus save it so far as is consistent with the statute.

It is, I think, important that this common law rule of construction should be adhered to, if it can be, consistently with the statute; for upon any other, no power under the article will be sustained, unless drawn *within the very terms of it.*  This would be exacting a precision before unknown; and probably endanger many titles to real property derived through powers since these statutes took effect.  The profession naturally look to the common law for the rule in giving effect and operation to those specified in the statute, presuming that the limitation there prescribed is no more peremptory or destructive in its effect than that which existed before; that inasmuch as a general discretionary power might then be brought by construction within lawful bounds, and is deemed to that extent operative, so it would be since.  No possible evil can grow out of this view, as applied to the statute powers; because if the proper limit is exceeded in the execution, the excess will be void.  This we have seen is the common law rule, and it is now in the statute.  By the 123d §, 1 *R. S.* 736, " no disposi- [275] tion by virtue of a power shall be void in law or in equity, on the ground that it is more extensive than was authorized by the power, but every estate or interest created, so far as embraced by the terms of the power, shall be valid."  The terms of the power in this case being thus brought by construction within the proper limit, a lease beyond twenty-one years would of course be void for the excess.  The argument, therefore, against the view I have taken, is founded altogether upon a technicality; it destroys the object and intent of the power, when both might be saved.

Without pursuing this branch of the argument farther, if I am right in my conclusions, it follows that the entire will is valid: the life estate to the sons and daughters, the power to lease, and of appointment, and in default thereof the remainder over to the special and general heirs.  Every intent which the testator had in view may be fulfilled with the exception that the discretion of the life tenants to make leases upon their estates is somewhat restrained; the latitude given exceeded the limit of the law; but it may be said to be an unimportant disappointment when compared with other provisions of the will, and ought not to be permitted to work its destruction.  Neither does this view supersede the effect of the 92d §; that operates where the power is so granted that an execution is impracticable within its terms agreeably to those enumerated in the article; as also to cut down a more general discretionary one, than allowed within the prescribed limit.

But if I had come to a different conclusion, and been obliged to hold the power to lease void, still I could not concur with the court below in breaking up the other independent portions of the will.  This, though a valuable provision in respect to the estates of the life tenants, is not so connected with them, but that they can be easily separated; nor are they at all dependent upon it.  They constitute a distinct independent estate of themselves, well known to the law; and common in these family settlements.  Even if the power is given up altogether, we cannot but see that every part of the inheritance is still well devised, and goes to the persons intended by the testator; there is no necessity [276] for the interference of the court; Mr. Stuyvesant did not intend to die intestate in respect to any part of his estate, and unless we interfere, he will not.

147

Root v. Stuyvesant.

There are numerous cases where powers which were engrafted upon family settlements, have been declared void, but the estates themselves, if well limited, remained. In the case of Sir John Lade, (3 *Burr.* 1416,) who devised his lands to trustees in trust for a person in strict settlement, and also divers remainders over in strict settlement; with a power that as often as any of the tenants for life, or in tail, for the time being entitled to the possession, should be under the age of twenty-six years, the trustees should enter and take the rents and profits, and dispose of them as therein directed, the power was declared void, as tending to a perpetuity, but still the settlement was not in any other respect disturbed. The Duke of Marlborough attempted to create a perpetuity by empowering his trustees on the birth of a son of any tenant for life, to revoke the uses before limited to him *in tail male,* and reappoint the estate to him for life; it was apparent that in this way the estate might be carried through any series of generations. The power was declared void for that reason, but the limitations of the estate in the settlement remained good. The principle is a familiar one, and was not intended to be disturbed by the chancellor. He argues that the general and important intent of the testator was, to give a beneficial estate to his *children* in preference to remoter descendants; and that the loss of the power so far defeats this intent that the will cannot consistently be upheld. But it must not be forgotten that it is at least equally clear that the testator did not intend his children should take the fee: *that* he secured to their children, or descendants. For aught we can know he had good reasons for thus withholding it. He may have considered them improvident or incumbered with debts. Indeed, we see that he released by his will a judgment against the respondent to the amount of nearly $30,000. Suppose debts existed against him large enough to sink the estate? The considerations which influenced [277] the court below in defeating the will, would then entirely fail. The beneficial interest sought to be secured to the respondent, would only operate as a benefit to the creditors. We cannot comprehend the operations of the mind of the testator, and hit with certainty the motive that led to this provision. The nearest approximation to be made, is by considering the language he has used; and regarding it with all the extraneous lights that have been put forth in the bill and answer, I am still unable to say, that the intent to give *the power to lease,* was paramount to that which operated to give *the estate for life;* or that if he had known the power to be void, he would have given the fee. On the contrary, the peculiar and special feature of the will appears to be the provision which secures beyond contingency, the estate to the descendants of his children; that is the object and end of the whole will; the life estates, the power of appointment, and the remainders over in default, are all in furtherance of this design and agreeably to the rules of law. Thus the life estates are an inseparable part of the scheme of this family settlement, and must be maintained to carry it into effect. If I must take the place of the testator, and decide for him, whether he would give up the power to lease or the residue of his will, as both cannot stand, I must say, he would have yielded the former; that the disposition of the residue does not necessarily hang upon it; indeed, it constitutes no part of the testator's estate, as the whole is well devised without it; it would improve the value of the gift to the life tenants, and may be regretted that it cannot be sustained, but the estate still remains to them, and it seems to me to be yielding too much to this *diminution of value* by the loss of it, to permit it to work so potent an effect as to destroy the estates of the life tenants, all the estates in remainder, and the other powers in the will; to destroy, in other words, a legal and valid disposition of the entire estate of the testator. Upon any view, therefore, that I have been able to take of the case, I am of opinion that the estate is well devised, and that the decree below should be reversed.

[278] By Justice BRONSON. The executors did not take the legal estate in the lands; it vested immediately in the devisees. (1 *R. S.* 727, § 47, 49, 58.) But the authority to make partition was valid, as a power in trust. (§ 58.)

148

Root v. Stuyvesant.

We may then consider the case as though the devise had been made directly to the sons and daughters of the testator. It is not material to notice that the sons and daughters were to take unequal portions; and for the purpose of rendering the question to be decided more simple, I shall consider the case as though all the devisees had been provided for in that clause of the will which relates more particularly to the sons.

The general frame of the will is as follows: The testator gives to each of his nine children, an estate for life in his or her portion of the land, with power to make leases for life or lives, or for a term not exceeding sixty-three years; and a power by last will to devise and appoint the estate to one or more of the children, grand-children, nephews and nieces of the devisee, for such estate, and subject to such powers and provisoes, as the devisor shall think fit. And for want of such appointment, and so far as the same shall not extend, the testator gives the estate of each devisee to his or her children and grand-children in fee; and if the devisee shall leave no children or grand-children, the testator then gives the estate to his own right heirs for ever.

The questions are, *first*, whether any and what portions of the devise are void; and *second*, if any part is invalid, whether that will overturn the whole disposition.

1. The estates for life, and the remainders over in default of appointment by the devisees, are free from all possible objection. The power of appointment is also valid. The only objection urged against it, is, that the devisees may appoint a life estate to a person not in being at the death of the testator, which the law will not permit. (1 *R. S.* 723, § 17, 129.) This objection goes to the mode of executing the power, rather than to the power itself. The devisees may appoint a life estate to a person *in esse* at the death of the testator, and they may appoint a fee to any and every object of the power, and such appointments will be valid. The power is conferred in general terms, and most [279] of the modes in which it can be executed will be free from objection. If an illegal execution is attempted, it will fail; but the possibility that the grantee of the power may attempt to do a nugatory act under it, cannot overturn the power itself. If it were a power to do a particular illegal act, the power itself would be void. But a general authority to dispose of an estate, either by deed or devise, cannot be invalid, merely because there is a possible mode of execution which the law will not permit.

Although the power to make leases is broader than that authorized by the statute, (§ 87,) I am inclined to the opinion that it is not wholly void, but that leases for a term not exceeding twenty-one years would be valid. But as this will abridge the power of leasing, as contemplated by the testator, the argument against the will is of nearly the same force as it would be had the power failed altogether. I shall, therefore, in the further examination of the case, assume that the power is worthless.

The case will then stand thus: Considering them separately, the life estates, the power of appointment, and the remainders over in fee in case the power shall not be executed, are all valid. The power to make long leases is alone void. This brings us to the second general question.

2. Will the failure of the power to lease overturn other portions of the will, which are in themselves free from objection? The children of the testator insist that the whole will must fall; and that instead of taking life estates with a power of appointment under the will, they are entitled to the whole estate as heirs at law. They say, that owing to the peculiar circumstances of the property devised, the life estates without the power of leasing, are of no value; that the power to lease was a beneficial interest, inseparably connected with the estate; and that the intention of the testator has been so utterly defeated by the failure of the power, that the whole devise must fall to the ground.

The written arguments on which this case has been submitted, assume that a

Root v. Stuyvesant.

life estate in the lands devised, without the power to lease in the manner [280] contemplated by the testator, is of no value. Although this seems to be an amicable suit, I find no such fact in the statement and admissions of the parties. It appears from facts admitted, that the lands devised consist, *in part*, of about 600 vacant building lots in the city of New-York, which are so situated that large sums of money must be expended in levelling the ground, pitching and paving streets, constructing and draining sewers, forming public squares, preparing the property for public improvements and exigencies, and placing it in a condition to be attractive to purchasers and productive to the owners. It also appears that the taxes and assessments upon the property have been heavy, and that a part of the land has been sold by order of the court of chancery for the payment of those charges. It may be true, though I am unable to infer the fact from these statements, that a life estate in the 600 vacant lots would be worthless. Such a conclusion is rendered the more doubtful from the allegation in the bill, that the lots " are in the vicinity of the compact part of the city ; and in the ordinary course of rapid growth to which the city seems destined, these lots will soon be required for building, and form a portion of the well-built part of the city." I am unable to say that a life estate in such property is not worth having. Had the devise been made to strangers instead of children, I cannot decide that they would reject the gift for the want of power to make long leases. If a life estate in the vacant lots be in truth worthless, and that fact is deemed important, it should have been plainly stated. But if a life estate in the vacant lots is worth nothing, it may still be that the devisees have acquired very valuable interests under the will. We are not told how much improved property was included in the devise ; how many houses, stores and shops may now be yielding an annual revenue to the devisees. It does appear by the bill, that besides the vacant lots, there were " lots with buildings erected thereon." How many such lots there are, and what is the annual value of this part of the property, is not disclosed. There is, however, an allegation in the bill in relation to the income of the property in these words : " that the aggregate revenue [281] of all the shares of the real estate, *excepting those of your orator and Mrs. Catlin*, does not exceed two hundred dollars per annum." This leaves us as much in the dark as we were before. How much revenue is received by the complainant and Mrs. Catlin on their shares of the estate, seems to have been purposely kept out of view. In attempting to state " the aggregate revenue of all the shares," why should two shares have been excepted ? If it was important for the court to know anything about this matter, it was important to know everything. If seven of the devisees only get $200 per annum from the real estate, we cannot *guess* that the other two get no more. It is possible that in the partition which has been made between the devisees, the improved property, or as it is called in the bill, " lots with buildings erected thereon," all fell to the shares of the complainant and Mrs. Catlin; and that those whose shares are at this time less productive, were compensated in the quantity of land assigned to them. We must judge of this matter as the testator left it, and not in reference to any subsequent arrangements between the devisees. There is nothing in the bill from which we are authorized to infer that a life estate in the lands devised is not worth ten or twenty thousand dollars, or even a much larger sum per annum, without any power to make long leases.

The argument constantly assumes a state of facts that does not appear to exist. We cannot, from anything alleged in the bill, pronounce that these are " barren life estates," or " worse than barren estates ;" that they are " worthless," or that " the soul of the gift has fled," leaving nothing to the children but " the empty shells and husks of an estate." The facts of the case not only fail to support but they actually contradict these statements. It is not alleged in the bill, that a life estate in the the vacant lots alone, would be worthless ; and if we must resort to conjecture, I have no doubt that it would be of considerable value. But

Root v. Stuyvesant.

including all the lands devised, we know that a life estate is valuable.  The fact is admitted, though the amount of annual revenue is not stated.

The most that we are authorized to say upon the pleadings, is, that a [282] power to make long leases would probably render the life estates more valuable.  The devisees have an undoubted right, as an incident to their estate, to make leases for their own lives respectively, or they may lease from year to year.  If they could lease for a certain term of sixty-three years, it is probable that a larger annual rent could be obtained, especially for the unimproved part of the property than would be paid for leases depending on the uncertain continuance of human life.  If they were authorized to make leases for sixty-three years, they could only take the rents and profits during life; the subsequent rents would go with the inheritance.  The will prohibits them from taking any fine or reward on making leases, and they could gain nothing by the power to make them, beyond the difference in annual value between such leases as are contemplated by the power and leases depending on life.  What that difference would be, we have no means of determining; it is not stated by the parties, nor are any facts given, from which we can make a probable estimate.

The case is then narrowed down to this :  The testator gave life estates to his children, with a power to make long leases, and a power of appointment among their descendants; and in default of such appointment, the testator himself disposed of the remainder in fee.  Every thing is legal and valid, except the power to lease, which has failed.  The estate without the power, is not worthless, though it is less valuable than it would be, had the power been legal.  Can we, on this state of facts, pronounce the whole devise void, and hold that the lands have descended to the heirs at law ?  I think not.  I can discover no legal principle which will conduct us to such a conclusion.  The testator has given way to a feeling which seems to be very common among men of large estates, and has attempted to continue his property as long as was practicable in his own family.  But as he has not created an illegal perpetuity, we have no choice but to execute the will, so far as it is consistent with the rules of law.  Much as I may regret that the immediate descendants of the testator will probably fare worse than his more remote posterity, it is not in my power to apply a [283] remedy.

If the case had been much stronger than it is—if, as the argument supposes, the whole value of the life estate depended on the power to lease, I should still be unable to say that the devise was void.  For the purpose of meeting the argument in its full force, I shall assume that the life estates without the power, are in truth worthless.  It may be very proper that the whole will should fail in such a case; but it belongs, I think, to the legislature—not the courts—to declare that such a consequence shall follow.

  . It is said that we can declare void those parts of the will which are in themselves free from objection, either on the ground that there is an inseparable connection between the life estates and the power to lease, or because the failure of a part of the intent of the testator defeats the whole.  Although the two grounds have not been kept very distinct by the counsel, I shall consider them separately.  We cannot act on the notion that the case is a hard one, and that somehow or other we have the power to apply a remedy.  If we can declare the whole devise void, it must be on some legal principle which can be plainly stated.  Nothing can be more dangerous in the administration of justice, than to give way to what may seem the natural equity of a particular case, when we can find no solid ground on which to place our decision.

There is no inseparable connection between the life estates and the power to make leases.  A power, as defined by our statute, is an authority to do some act in relation to lands, or the creation of estates therein, or of charges thereon, which the owner granting or reserving such power, might himself lawfully perform.  (§ 74.)  It is not an estate or interest in the land, but an authority to

151

Root v. Stuyvesant.

create an estate or interest. A power may be given to a person who has an estate in the land, or to a mere stranger. The name of the power is different in the two cases, but its nature is not changed. In either case, it is the execution of the power, and not the power itself, which creates property. The au-[284] thority granted to each of these devisees to make leases, would at common law be termed a power appendant or appurtenant, because it depends on the estate of the person to whom the power is given. The power must to some extent have its operation out of the estate of the person executing it. The lease is served out of the whole fee, and either wholly, or *pro tanto*, displaces the life estate. (1 *Sugden on Powers*, 43.) Under our nomenclature, it is called a beneficial power, because no person other than the grantee has, by the terms of its creation, any interest in its execution. (§ 79.) Had the power been granted to a stranger, it would then be termed at the common law a power simply collateral, and under our statute a power in trust. (§ 94, 5.) The power was no part of the estate of the tenants for life. It neither enlarged nor imparted any new quality to that estate. The estate was as complete without the power as it was with it, though the execution of the power might render the enjoyment of the property more beneficial to the devisees. It is in vain, then, to contend that there is an inseparable connection between the two things. The testator might have granted the one without the other; and although he has granted both, the devisees may retain the estate without executing the power. Indeed, we cannot know that it ever would be executed, had it been valid. It is impossible to maintain that there is such an indissoluble connection between the estate and the power, that the one cannot exist without the other. Although both were created by the same instrument, they are not the same structure. The one may stand while the other falls, because they do not rest on the same foundation. The one is legal, the other illegal.

. We are referred to the cases on the will of Mr. *Lorillard*, and that of Mr. *James*, (14 *Wendell*, 265, and 16 *id.* 61;) but there is nothing in either, which can aid the respondent. In each of those cases, all of the estates and interests which were declared void, sprung out of an illegal trust; they were built on the trust, and necessarily fell with it. They had no separate existence, but were part and parcel of the trust; and declaring that they must fall with it, [285] was little more than affirming the axiom that the whole includes all its parts.

It may be conceded that by giving the power to make long leases, the testator intended to make the life estates more beneficial. Still they are distinct gifts, and if the failure of the one can destroy the other, it must be on some other ground than that of an inseparable connection between the two things.

The remaining argument against the validity of the will is, that the intent of the testator having failed in part it must fail altogether. This argument concedes, what cannot well be denied, that there is no inseparable connection between the life estates and the power ; but inasmuch as the estates without the power will be of little or no value, it is said that the intent of the testator has been so far frustrated that the whole devise must fall to the ground. The statute has given us no such rule as this, nor have we been referred to any authority in support of the position. The notion that one part of a will, which is in itself free from objection, can be overthrown on the ground that another independent provision is contrary to law, is of very recent origin. I find no trace of it in adjudged cases. It has often happened that a part of the intent of a testator has failed, but courts have never ventured for that cause to declare the residue of his purpose void. Very striking cases have arisen under the statute which required wills of real estate to be attested by three witnesses, while wills of personal property required no such solemnity. Wills professing to dispose of both real and personal estate, but not duly executed to pass the real, have nevertheless been held good for the personalty. That was adjudged by this court in

Root v. Stuyvesant.

*Watts* v. *The Public adm'r of N. Y.*, (4 *Wendell*, 168,) on the will of *John G. Leake*. In Massachusetts, they applied a remedy to cases of this kind as long ago as 1783 ; but they did it by legislation, not by judicial decision. The statute is cited, and its practical operation illustrated, in the cases of *Osgood* v. *Breed*, (12 *Mass. R.* 525) ; *Dean* v. *Littlejohn*, (1 *Pick.* 239), and *Brown* v. *Thorndike*, (15 *id.* 388.) It is admitted in these cases that the statute changed the common law rule. In this state also, a remedy has been applied by a [286] statute which requires the same solemnity in the execution of all wills. (2 *R. S.* 63, § 40.)

The question under consideration has been urged upon us as though there was something peculiar in this case. It is said that the testator had a general intent; a connected and complete scheme for the settlement of his estate, and that when a link is broken the whole must fail. It is equally true that almost every man who makes a will has a general intent ; a scheme either more or less complicated for disposing of his estate. And it is true of other cases as well as this, that the failure of a part, however unimportant it may be, breaks in upon the general plan. But where, as in this instance, the entire scheme is made up of several and distinct parts, I find no legal principle which will authorize us to say that the failing of one part will overturn another. When a testator makes several persons the objects of his bounty, what he gives to A. must of necessity have some reference to the provision made for B. ; but if the gift to A. is free from objection, courts have no discretion to declare it void because the gift to B. is illegal. This testator has given a life estate to each of his children, and in a certain event, has limited remainders in fee to others. Let it be granted that the life estates are void, I see no reason why the remainders should not take effect. If the precedent estate was void in its creation, the limitation over may take effect as an executory devise. And besides, under our statute a freehold estate may be created to commence *in futuro.* § 24. If the estates limited, in default of appointment by devisees, are void, it must be on the ground that when a part of the intent of a testator fails, the whole is gone ; that if a gift to A. is void, a gift to B. is also void. To this doctrine I cannot subscribe.

It is said that when this will was made, all its provisions were legal. That is true of the original execution in 1828. But this will was made when it was republished by the testator, in 1833, and then the power to lease was void. It is said also, that had the testator known the power was void, he would have altered this, or made some other will. That is more than we know. [287] But if we may presume the fact, it might upon the same grounds have been presumed in every case where a testator has inserted an illegal provision in his will. There is nothing in this case to distinguish it from others, where the question has arisen whether a will may not be good in part and bad in part. In the case of *Hawley* v. *James*, (16 *Wendell*, 61,) nearly the whole plan and scheme of the will was based upon an illegal trust ; the different estates and interests all depended on a perpetuity, which the statute had declared void in its creation ; and of necessity the whole building fell when the foundation was removed. But the court seized upon and saved everything which could be separated from the illegal trust, and thus affirmed what I regard as an established principle, that effect must be given to everything in a will which is legal, and which does not stand indissolubly connected with that which is vicious. In that case the court went so far in asserting this principle, that I was unable to agree with the majority on two or three of the subordinate questions. It was not, however, a difference about the existence, but concerning the application of the rule.

There is much that is plausible in the argument that when a part of a will fails, the whole ought to be overturned. But what have we, as ministers of justice, to do with it? It should, I think, be addressed to those who make, not to those who administer the laws. The law, as I read it, has not only omitted to provide that courts may declare void those things which are legal, but it has, in

Root v. Stuyvesant.

express terms, given a different rule, and one directly applicable to this particular case. When the true meaning of the testator in the several parts of his will has been ascertained, the statute declares that it shall be the duty of courts of justice to carry into effect the intent of the party, so far as it is consistent with the rules of law. (1 *R. S.* 748, § 2.) The rule is not that we shall carry the will into effect if *all* is legal, but *so far* as it is legal. We have, I think, just as much authority to declare an illegal provision valid, as we have to say that a legal one is void. For myself, I utterly disclaim all authority to do either the one thing or the other.

[288] Should the legislature review this subject, they would, I think, find no middle ground between the present rule, which saves all that is good, and one declaring that any illegal provision should render the whole void, which would overturn very many wills. Any attempt to specify the particular circumstances which should defeat the whole disposition, would, from the nature of the case, be likely to prove a vain effort. Should it be referred to the discretion of the court to say when the failure of a part shall avoid the whole, the validity of wills would no longer depend on the law, but on the sentiments and feelings of the judge; and the same will would be valid in one court and void in another. No man could know when a will or a title derived under it, was valid, until the question had been solved by a protracted litigation, ending in the court of last resort. If we now had such a discretionary power as we are asked to exercise, we could decide this case either the one way or the other; but we could lay down no general principle which would either bind this court or serve as a guide to subordinate tribunals in deciding upon other wills. When we declare the law of a particular case, we bind those who come after us. But when we exercise a discretionary power, we bind nobody; for the discretion of one man is not the discretion of another. There is a class of questions which must necessarily be referred to the sound judgment of those by whom they are to be settled. They relate for the most part to the practice and proceedings of courts, and rarely, if ever, directly involve the right of the parties. To make the title to property, whether claimed under a deed or a will, depend on the discretion of the court, would be an anomaly in the law.

The *cy pres* doctrine has been pressed into the argument, and as disparaging epithets have sometimes been applied to that doctrine, it may not be amiss to show that it does not lie in our way on the present occasion. This rule of approximation, as it is called, goes beyond that given by our statute, which requires us to give effect to all that is legal in a will, and in a modified form upholds things which are in themselves illegal. When the mode in which a testator [289] proposes to execute his general intent in the disposition of real estate is contrary to law, courts have sometimes felt themselves authorized to disregard the particular illegal intent, and give effect as far as the rules of law would permit, to the general intent in another form. They have thus executed (*cy pres*) as near as possible the will of the testator, instead of leaving it to fall to the ground, because the mode of execution which he contemplated was illegal. The doctrine is stated, and many of the cases on the subject are referred to, in the note of Mr. Butler to *Fearne on Cont. Rem.* 203, 3d *Amer. from 8th Lond. ed.* The rule of approximation was recognized and applied in *Jackson* v. *Brown*, (13 *Wendell*, 437.) In the case under consideration, both parties agree that the power to make leases is void, and neither party proposes to give effect to it in any modified form. We have, then, nothing to do with the *cy pres* doctrine, and whether it should be repudiated or approved, is a question with which we need not trouble ourselves at this time.

It seems to be supposed that the language which I used in *Hawley* v. *James*, (16 *Wendell*, 144,) concerning a will, good in part and bad in part, militates against the validity of this will. Although the remark referred to was a general one,

Root v. Stuyvesant.

and not on the turning point of that case, I see nothing in it to qualify or recall; nor can I perceive how it favors the overthrow of this will.

If I have not erred in the views taken of this case, the respondent only had a life estate in the land, and could not make a good title to the purchaser. It follows that the decree of the court of chancery is erroneous, and should be reversed.

*By Justice* Cowen. This is an appeal from a decree of the court of chancery, by which it is declared that the will of Nicholas William Stuyvesant, deceased, is in part void, and that his real estate, therefore, descended to his children and heirs at law, in unequal portions.

The will was republished, and took effect, by the death of the devisor, after the enactment of the Revised Statutes. and must therefore be governed [290] by their provisions. It is not denied that all the estates created by the will would, standing alone, be valid within those statutes. The estates are *first*, for the lives of the respective sons and daughters in unequal portions; *secondly*, a remainder in fee to the lineal descendants of those sons and daughters respectively; and *lastly*, in default of lineal descendants, then to the devisor's right heirs in fee. But it is objected that all these devises are void, on account of the failure of two several powers which the will sought to create ; one was a power to each tenant for life, *to make leases for three lives or 63 years.* The other was *a power to each to appoint by will to, or in trust for, his children, grand-children, nephews and nieces, such estate as he should think fit.* I had occasion to consider both these powers in the late case of *Salmon* v. *Stuyvesant,* (16 *Wendell,* 321,) which came here upon the same will, and in which this court reversed the chancellor's decree, upon the alternative ground that the devisees were at least to be considered good or bad *in toto,* and that in either view, the respondent could not make a good title. The parties dealing in these lots, both devisees and purchasers, have, as is very natural to suppose, a decided preference for that side of the alternative which would destroy the will as to the real estate, and give them a fee by descent. They appear to be content with the dispositions made of the personal property, or at least hopeless of disturbing them ; accordingly, since the decision in *Salmon* v. *Stuyvesant,* they have made up a case by releases among the heirs, real or assumed, which secures them the benefit of a title in fee, provided we shall be of opinion, on further consideration, that the nullifying side of the former decree is the correct one.

On examining the provisions of this will, after the argument of *Salmon* v. *Stuyvesant,* I came to the conclusion, and so expressed myself, that the power to devise was valid, as not being necessarily larger than the Revised Statutes allowed. I have since seen no satisfactory reason for changing my opinion. I do not think we are required by any rule of construction, to declare that a power which, when executed in a proper way within legal limits, would be perfectly [291] valid, is void, because an abortive attempt may be made under it to create an estate so remote as improperly to suspend alienation. The will empowers the testator's sons and daughters respectively, by last will and testament, to devise and appoint the land, in which they take a life estate, or in or in trust for any one or more of their respective *children, grand-children, nephews and nieces,* for *such estate or estates,* and *subject to such powers and provisoes* as they respectively *shall think fit.* It is supposed that in virtue of the power to appoint such estate or estates, &c., as they may think fit, they may not confine themselves to *legal* estates, but may attempt to create a perpetuity. That is true ; but it is equally clear that they *may,* and undoubtedly would confine themselves to the creation of legal estates for life or in fee to *children, nephews or nieces;* and to such legal estates, I think the power must be restricted in its interpretation. It is the same as if it had declared in so many words, that the estates to be created were intended to be *legal estates,* and it should be read in that way. It never could operate in any other way, and it is entirely gratuitous to suppose the tes-

Root *v.* Stuyvesant.

tator intended that the devisees should make an illegal attempt. It is contrary to the common presumption, which is, that every man intends to act according to the law; and the contrary seems to me an extremely unnatural and forced construction in this instance. The passage can hardly be read or understood in any other than a perfectly innocent sense. But if it were capable of being read different ways, the one in a legal, and the other in an illegal sense, clearly it should be read in the former. Mr. *Roberts*, in his *Treatise on Wills*, 431, *note*, says, " if words admit of a twofold construction, the rule is, to adopt such as tends to make good the instrument, even in case of a *deed*, and much more of a *will*." These are the words of Mr. Justice Lawrence, in *Thellusson* v. *Woodford*, (4 *Ves.* 312,) where he says " read this will with reference to the rules of law, and there can be no doubt." So we may say here, read this appointing power with reference to the rules of law, and it is indeed very strange that a doubt [292] should ever have arisen. Mr. Justice Lawrence refers to *Atkinson* v. *Huchinson*, (3 *P. Wms.* 260,) where lord chancellor Talbot lays down and applies the same rule. I feel clear that his honor, the chancellor, has reversed the settled rule of construction, in supposing that this appointing power can be so read as to make it any thing but legal and valid.

On the other hand, I confess I am inclined to think in this case as I did in *Salmon* v. *Stuyvesant*, that the power to lease for 63 years was void for the whole time, till I had been favored with the views of the chief justice. I certainly hesitated whether, in the spirit of that benign and liberal construction which it is always our duty to exercise for the maintaining of wills, the power might not be considered good for the 21 years allowed by the statute, though void for the excess. I should have felt no difficulty on that, had not the statute expressly declared all beneficial powers not conformable with itself to be invalid. It was held in *Alexander* v. *Alexander*, (2 *Ves. sen.* 644,) that the execution of a private authority should be valid as far as it pursued the power, but void for the excess only. I never could entirely satisfy myself why the same rule should not be applied to the exercise of a legislative power. If it be so applicable, then, although the will in question undertakes to delegate an authority for 63 years, you are to read it in the light of the statute, which restrains it in effect to 21 years. If you read it in that way, then it comes down to the legal limitation, and on reflection, I feel better satisfied with that construction.

Such a view, however, does not vary the principle on which this will is assailed. The leasing power is still abridged or voided for 42 years. The respondent chooses to assume the round proposition, that it is void for the whole; and, for the sake of the argument, let it still be conceded that he may be correct in that assumption. After reaching that ground, the respondent's bill proceeds to state that the leasing power was a *fundamental point*, upon which the details of the will were framed, and that without it, the intention of the testator could not be carried into effect. In support of this proposition, he shows [293] that some part of the estate devised is in the neighborhood of the city of New-York, the ordinary course of whose rapid growth will require the vacant lots of the estate for building; that to fit these lots for market, large sums must be expended; that during the testator's life he made various arrangements and at great expense to secure that object; that he disposed of some lots, and gave and took building covenants; that large assessments of taxes have been made and will be necessary; that the income of the property is and must continue to be comparatively small, unless a greater interest is given to the heirs than can be taken under the will, as that must be construed by the Revised Statutes. In short, the bill goes into a great many particulars, by which it is sought to show the highly flattering prospects of this part of the city, if an adequate estate be allowed to the children; and the disastrous consequences both to the estate and the city, if this will is allowed to stand. A map of proposed city lots is produced to illustrate these particulars. The stating part of the bill concludes thus: " The *peculi*˙

Root v. Stuyvesant.

circumstances of the estate of the testator afford conclusive evidence that if the testator had been apprised that the Revised Statutes reduced the power of leasing for years, he himself would have annulled the will, and made some provision by which his *children* could have rendered the estate valuable to themselves.   That he would have done this either by a direct devise in fee, or by suffering the estate to descend to the children as heirs at law."   The *answer* admits all the facts stated in the bill, with its colorings and conclusions.

I have briefly gone through the details of the bill with a view to what appears to me a very obvious remark: which is, that every thing set forth beyond the will itself, in order to impeach its validity, is impertinent.   That had the train of extrinsic facts here stated been denied by the answer, or left to evidence, some of them would have stood entirely incapable of proof in their own nature, whilst all would be treated as surplusage.   The rule of law forbids that the plain and unambiguous language of a will should be contradicted, explained, or in any way affected by parole evidence.   We are required by all the authorities to read the effective provisions of the will, and govern ourselves by these as [294] they appear upon the face; and we have nothing to do with the question, whether the estate created be more or less beneficial to the devisee, or the neighborhood in which the land is situated.   Testators in former times, often left out words of inheritance in cases where no one could doubt, upon extrinsic circumstances, that they intend to devise a fee.   Yet the courts could not supply the defect by looking at the object of bounty, or the inadequate value of a life estate.   (*Cole* v. *Rawlingson*, 1 *Salk.* 234.)   Suppose when the next lot comes into market under this will, the defendant should answer that it is in his opinion, more valuable to the devisee as a garden in the suburbs, than a city building lot; and the cause should like this, be set down for a hearing on bill and answer; let it be added that the devisee was a gardener, and the testator intended to secure him a piece of ground to occupy during his life; and the argument would be equally conclusive against, as it is now supposed to be for, the leasing power.

I certainly agree with the chancellor, that every will must take effect according to the law as it stands at the death of the testator.   I am only desirous that this principle should be acted upon entirely in disregard to matters out of the will, and out of the law in whose light it must be read and understood.   It should be borne in mind that the sole gravamen in the bill is, that by making this will in 1828, when our statutes allowed the leasing power, and by a supposed mistake, suffering it to take effect when the new statutes disallowed such a power, the estate of the devisees was inadvertently diminished in value.   Now in the first place, I must be permitted to deny on direct authority, that such a concourse of events can be noticed, even had these devisees been totally disinherited. The very point was resolved by Mr. Justice Story in *Adams* v. *Wilbur*, (2 *Sumn.* 266.)   In 1801, the testator, a resident of Rhode-Island, having no issue, made his will, by which he devised all his estate to his wife.   There was then a statute of that state providing that, notwithstanding such a will, on a child being born, it should take by descent.   The statute was repealed in June, 1803, and the testator had a son born in August, 1804.   Evidently [295] believing that the old statute still remained in force, he neither destroyed nor altered his will, and died in three or four months after.   Counsel there argued, as they do here, that to give the will effect according to the new statute would be to destroy the presumed intent of the testator in favor of his infant son. The answer of the learned judge was this : " The will was ambulatory during the life of the testator, and no title could accrue to the son until his death.   The son is to take, not by the bounty of the testator, but by the operation of law.   Now, at the time, if ever, when his title was to accrue, there was no act in force which conferred any such title upon him."   I have said this case is directly in point.   I will add it was a much more plausible case against the will than the present. There the new statute, by giving the subsisting will a different effect worked a

157

Root v. Stuyvesant.

total disinherison of the issue. In the case at bar, it works comparatively a very inconsiderable change against them. *Marriage* and issue have been held to work an implied revocation of a previous will. (*Pow. on Dev.* 369.) In short, the case of *Adams* v. *Wilbur*, negatives in the strongest manner every proposition involved in the decree here appealed from; and on the point blank authority of such a distinguished jurist as decided that cause, I should, in an ordinary case, feel myself entirely authorized to repose. There are circumstances, however, in the case at bar, which demand a brief recurrence to the principles on which the decision is founded, and which, I think, demand their rigorous application.

If we receive such a case as any and every devisee and purchaser under this will may choose to surmise by amicable bill and answer upon foreign circumstances, beside the evil of kindling up endless litigation in respect to the different branches of the estate in question, it seems clear to me that we shall be breaking in upon general rules which have been always recognized since our law made any pretensions to science. In *Lord Cheyney's case*, (5 *Co.* 68, 9,) on its being proposed by Sir Thomas Cheyney to prove the testator's intent by wit-[296] nesses, Wray and Anderson, Ch. Js., on conference had with other justices, "resolved that he should not be received to such averment out of the will; for the will concerning lands, &c., ought to be in writing, and the construction of wills ought to be collected from the words of the will in writing, and not by any averment out of it; for it would be full of great inconvenience that none should know, by the written words of a will, what construction to make or advice to give, but it should be controlled by collateral averments out of the will." In *Cole* v. *Rawlinson*, (1 *Salk.* 234) Holt, Ch. J. said, " the intent of a testator will not do, unless there be sufficient words in the will to manifest that intent, neither is his intent to be collected from the circumstances of his estate and other matters collateral and foreign to the will, but from the words and tenor of the will itself; and if we once travel into the affairs of the testator and leave the will, we shall not know the mind of the testator by his words, but by his circumstances, so that if you go to a lawyer he shall not know how to expound it. Upon the will 'tis so, but with the matter found by the special verdict 'tis otherwise; and what if more accidental circumstances be discovered and be made the matter of another verdict? Men's rights will be very various upon such construction." (See *O'Brien* v. *Lord Inchiquin, Ridgw. Cas. Temp. Hardw.* 249, *S. P.;*) In *Strode* v. *Russel,* (2 *Vern.* 621,) it is remarked that no regard is to be had to what was said by the testator, but the question upon a devise "must be determined only by what is contained in the written will." In *Stanley* v. *Leonard,* (1 *Eden,* 94,) the lord keeper said, " in all these cases there is but one invariable rule; the intent of the testator must be collected from the will itself, and not conjectured." And much was said to the same effect in the late case of *Doe, ex dem. Hick* v. *Dring,* (2 *Maule & Selw.* 448.) Lord Ellenborough, Ch. J. said, "In the present case, if I were asked my private opinion as to what this testator really meant, I must suppose that he meant that which his duty prescribed to him, &c., but sitting in a court of law, I am not at liberty to collect his meaning from matter *dehors,* but only from the expressions used on the face of the will." Le Blanc, J. said, " If the court were at [297] liberty to look to extrinsic circumstances, to the nature or comparative value of the real and personal property, or to the situation in which the testator stood with regard to his family, in order to see what disposition of his property he probably intended to make, they would undoubtedly be inclined to say that he must have intended to pass his real estate. But that would be a very dangerous rule to go by, because it would be to say that the same words should vary in their construction according to the quantity of the property or the situation of the party disposing of it, &c. Therefore, to avoid any such incongruity, the court seeks the construction in the words alone of the will." (*See Page* v. *Leapingwell,* 18 *Ves.* 496 *; Ram. on Wills,* 41, *and the cases there cited.*) By these cases, and

Root *v.* Stuyvesant.

many others that might be cited, it will be seen that the rules of construction are the same both at law and in equity, and that when we are told of the market-able value of Mr. Stuyvesant's vacant lots, of taxes, and improvements, and building covenants, and ignorance of law, we are left precisely where we stood before. Such circumstances are, as I remarked, impertinent, and altogether out of the issue. In the language of the present chief justice, in *Coster* v. *Lorillard,* (14 *Wendell,* 349,) to notice them " would be arbitrary, and establish a precedent for courts, not to construe wills according to the intent of the testator, *as derived from the language used to express it,* but to make a will for him, such an one as we undertake to presume he would have made, if advised that his own was void as against law."

I have also said that some of the facts put in issue are utterly incapable of proof, and such as the law never will inquire into. Among these is the fact so much relied on in the court below, and here again in argument, that the testator committed a mistake of the law. " If," says his honor, the chancellor, " the testator could have known that the operation of his will under the provisions of the Revised Statutes relative to powers, was to deprive his children of all beneficial interest in his estate, and to tie it up for the sole benefit of another generation, it is very evident that he would have given the *fee* to his children, or have devised to them *an absolute term of 63 years.*" I shall by-and-by [298] have occasion to notice that this remark can probably be applied to but a portion of the estate affected by this will ; but for the present I must be permitted to ask, with great deference, but certainly with some emphasis, upon what authority are we to assume that this testator did not know the law ? Has such a principle of construction been before acted upon ? So far from that, the principle has often been denied. Through all the changes of the statute or common law, in all departments of business and duty, it has been the maxim of courts, that every citizen knew and was bound to know the legal rules by which his contracts, his wills, and his conduct, were to be governed ; and that the law of the land entered into and was to be read with and make a part of them, as if it had been actually recited. Was the year 1833, when this testator republished his will and died, a season of greater legal darkness than ever before shrouded the human intellect ? The Revised Satutes had been published for years ; they had plainly forbidden a leasing power so large as that in question ; they had slightly modified the right to create testamentary powers of devise and executed the trust to the daughters. Are we told that the testator could not read ? that his lawyer, who drew his codicil and examined his will, could not read the statutes ? Yet in all the numerous changes which they introduced in the law of property, and even of crime; the con-duct of the most humble individual has, from the moment of their passage, been relentlessly judged by them. The testator makes a will in 1828, which according to the law of that day had one effect. In 1833, he republishes that will, or suffers it to stand under a law which gives it another effect, each equally valid. By what authority are we to adopt, as a principle of construction, his knowledge in 1828, and his ignorance in 1833 ? Suppose he had committed a mistake in 1828, was that the day of saving light, and 1833, an hour of darkness which is to destroy a testament, as if its author had been of unsound mind ? No. When first made, the will contained a valid power to make leases. After the Revised Statutes, the tes-tator, by republishing his will, or even suffering it to stand, strikes out the power. It is a change which he had a right to make. He has done so, [299] in effect, as plainly as if he had run his pen through the clause and thus obliterated the power, or changed it by a codicil ; and the same remark ap-plies to every other change in the will resulting from the operation of the Re-vised Statutes.

I remember that shortly after these statutes took effect, a thief broke into an out-house and stole an article of small value. In 1828 it would have been but a petty larceny ; in 1830, it was a burglary ; and though he had not yet a single year's

opportunity to learn the legal nature and consequence of such an act, the court sentenced him to the state prison. The argument was much stronger for his ignorance of the change which the law had undergone against him, than that which is now urged. Yet I ask what judge would have listened to it? In *Hunt* v. *Rousmaniere*, (2 *Mason*, 342 ; 8 *Wheat.* 174; 3 *Mason*, 294 ; 1 *Pet. S. C. R.* 1,) the parties committed a plain and admitted mistake of the law in framing a power of attorney by way of security for money ; so much so, that, in legal effect, it came altogether short of operating as both intended that it should. The supreme court of the United States held that the law bound every man to a knowledge of itself; that the presumption was conclusive, and men shall not be received to allege the contrary. So strong indeed was the presumption held in that case, that all the power of a court of chancery was pronounced unable to rectify the transaction or relieve against the consequences. The same principle has always been acted upon both by the court of chancery and supreme court of this state. (*Lyon* v. *Richmond*, 2 *Johns. Ch. R.* 51. *Clark* v. *Dutcher*, 9 *Cowen*, 694.) In the first case, Chancellor Kent says : " Courts do not undertake to relieve parties from their acts and deeds fairly done on a full knowledge of the facts, though under a *mistake of the law*. Every man is charged at his peril with a knowledge of the law. There is no other principle which is safe or practicable in the common intercourse of mankind." Mr. Justice Sutherland says, in the latter case : " The principle on which courts refuse to relieve against mistakes in law is, that in judgment of law *there is no mistake ;* every man being held, for the wisest reason, to be cognizant of the law." The Doctor and Student, [300] one of our most approved books, was written and published in 1518, more than 300 years since. *Ch.* 46 *of Dial.* 2, opens with this remark : " Every man is bound at his peril to take knowledge of what the law of the realm is, as well the law made by the statute as the common law." (*Muchall's ed.* 250.)

But if we were permitted to notice what is improperly called a mistake of the law, in respect to the leasing power, I have no doubt that both in legal effect and in actual influence on the affairs of the estate, it has been altogether over-rated. For the present, let us look at the legal effect. There is no failure of any *estate* which the testator attempted to create. In the many provisions of the will, so far as *estates* are concerned, reaching we know not how many interests and objects, everything is unquestioned and unquestionable. It is not pretended that anything of importance has failed, except a potential existence depending on the future heat of city speculation to warm it into life. I had occasion in *Salmon* v. *Stuyvesant*, which was the pioneer attack against these remaindermen, to remark that this was a collateral power ; or in other words, it does not exist in virtue of simple ownership. Counsel take issue by saying it is appendant and beneficial. Still it is collateral, though not *simply so ;* and it is so classed by *Mr. Powell*, in his *Treatise on Powers*, 8 *to* 12. Mr. Sugden's arrangement is slightly different; but the dispute does not depend on verbal classification. The power is not an estate. It is collateral to the line of limitation fixed by the will. The limitation is of *estates*, properly so called, for life and in fee. A power can neither stand as a particular estate, on which a remainder can be limited, nor can it be devised as an estate in remainder. Its failure as a nullity is exactly the same in effect as if it had been valid but the donees had refused to execute it. No one ever supposed that in either case the estates themselves by the side of which the supposed entity or nullity is introduced could be necessarily either nurtured or destroyed by it. No such influence was supposed by the chancellor, nor is it claimed in argument ; but although merely void, it is claimed that it should be read [301] in evidence, to show that the testator intended to make a valid power ; and farther, that should he fail in this isolated attempt, he intended that all the other provisions of his will should share the same fate. I must still be permitted to deny both the premises and conclusion. This is not the case of a thing being void for one purpose and good for another. " Void things are as no

Root v. Stuyvesant.

things; as a void award is said to be no award." (22 *Vin. Abr.* 13, *pl.* 17.) Surely the respondent claims a very singular influence, from what he admits has no legal existence. If the power be nothing, then, *ex nihilo nihil fit.* Assuming that the clause is *merely void,* it follows that it cannot be read for any purpose, and especially for the purpose of showing intention. This was expressly held by Lord Hardwicke in *Hearle* v. *Greenbank,* (1 *Vesey, sen*, 298.) The will there was valid as to the personalty, but void as to all the land. In respect to the latter, he said: " The will is void. Here is no will of the land." (*Id.* 306, 307.) He puts the point in several views, and would not notice the void provisions, even to raise a case of intention. He said, as to that void part, " the will was not capable of being read." (*Sheddon* v. *Goodrich,* 8 *Vesey,* 497, *per Lord Eldon.*) So Domat says of wills under the civil law, (*B.* 3, *tit.* 1, § 6, *art.* 3.) " The expressions which cannot have any meaning, are rejected as if they *had not been written,* and *do not hinder the others from having their effect.*" Indeed, I am not aware of its ever before having been supposed, that a clause which is merely void, could be invoked to establish the intention of a testator. Mr. Senator Maison said, in *Coster* v. *Lorillard,* (14 *Wendell,* 364:) " The trust being void, it is as though it never existed." So we must say of this power, it is as though it had never been written in the will. You cannot argue from it, any more than from the history of Lilliput or Robinson Crusoe. In the state of *Maine,* for some strange reason, one John Grace, in making a will of his own land, got his wife, Hannah Grace, to sign and seal it with him, so that it stood, and was intended to be their joint will. Being proposed for probate while the wife was alive, that was opposed, because it could not take effect as it was intended. Probably the object was to bar the wife's dower. It was [302] agreed, however, that, whatever was the object, it had failed ; and counsel argued that the whole will, therefore, failed. Mellen, C. J.. said " her joinder can have no effect on the disposing power of the husband. The will is *his* in the same manner as though *she* had not signed it. She was a mere cipher in the transaction, and all her declarations and acts must be rejected as surplusage." (*Rogers' case,* 2 *Fairfield's R.* 303.) In another case, the testator, after executing his will in presence of three witnesses, interlined a bequest, in presence of only one. Though the bequest was clearly void, yet held that it did not avoid the whole will. (*Wheeler* v. *Bent,* 7 *Pick.* 61.) Suppose the power in the case before us had been left out of the original will, but added in a *codicil attested by only one witness.* You may as well resort to one void thing as another, and for one purpose as well as another. The law has not divided a *zero* into degrees. I repeat the inquiry I made in *Salmon* v. *Stuyvesant*—how am I to infer, from what the law will not notice, that here was any intention to create an authority ?

In judging of intent, another rule forces itself upon us equally imperative with any which we have before considered; it is, that every man shall be held to intend the legal consequences of his own act. I have already remarked, that we are to read this will just as if the testator had incorporated in it all the provisions of the Revised Statutes any way applicable ; and then declared, that so far as those statutes allow, he desired his will might prevail, and that it should be void in those respects only wherein they declared it should be invalid. In *Blanchard* v. *Russell,* (13 *Mass. R* 16,) the court said: " The contract, being made under the law, is presumed to be made with reference to it; and the parties are legally conusant of it at the time. The law is a part of the contract." In *Mather* v. *Bush,* (16 *Johns. R.* 251,) Mr Justice Spencer said: " It cannot be controverted, that the parties to a contract are to be deemed acquainted with the laws of that state of which they are citizens, and in which they are contracting. They must be deemed conusant of those laws which regulate, control or affect their [303] contracts, &c. In construing a contract, &c., it must be understood in reference to any existing law which bears upon it, and may modify or control it." He adds, that this is the same in effect as if the statute controlling the contract had

Root v. Stuyvesant.

been inserted in it. The learned judge, in the course of his remarks, cites several cases to show that this would be so even of a stranger and sojourner; and this rule is abundantly established in the law of last wills. "Here," says Mr. Justice Story, speaking of real estate, "the doctrine of the common law is clearly established, that the law of the place where the property is locally situate, is to govern." (*Story's Confl. of Laws*, 398, § 474.) He makes no exception, nor does any book of the law. Although a stranger in a foreign land suddenly taken ill, the testator's will must take effect according to the law of the country where it is made, It must take effect as far as that law allows, and no farther. It were singular to say that a stranger should be held to intend the legal consequences of his will, and yet that Mr. Stuyvesant, who was born and bred, and always resided under our law, and who was in the neighborhood of the very ablest legal advisers, should have his will totally subverted, on the ground that he was ignorant of the statute of wills.

Nor let it be said, that because these parties have amicably agreed, by bill and answer, that Mr. Stuyvesant was ignorant of the law, therefore it is to be so taken. The agreement touches a matter of which these parties knew nothing; and if otherwise, the fact is totally immaterial, a legal *non sequitur*, of which no court can take notice. How idle, for instance, would be all the laborious and painful inquiries into the *lex domicilii* and the *lex loci rei sitæ*, in order to fix the construction of wills, if, after reaching such laws, we are to be nonplussed with the reply that the testator was ignorant of the *lex loci*, and all your commissions and sworn opinions of foreign jurists, are waste paper. Under this head of *lex loci*, I shall state a single case as applicable to and illustrating the question in hand. The court of delegates in England lately held that the law of [304] Portugal should exclusively govern the will of even a British subject domiciled there. (*Stanley* v. *Bernes*, 3 Hagg. Ecl. R. 373 to 465.) This case is the stronger, says Mr. Justice Story, because it is the case of a will and several codicils *made according to the law of Portugal*, and also of several codicils made *not according to the law of Portugal*. The former were held valid; the latter invalid. (*Story's Confl. of Laws*, 394, § 467.) I have already, in some measure, applied this doctrine to the case before us. By making, or which is the same thing, republishing a will under the Revised Statutes, the testator intended to give effect to it in the precise way which those statutes allow, and in no other. Accordingly, we have seen that he intended to strike out or abridge the leasing power, because it was opposed by the statutes. Upon the same principle he intended to save the estates for life, and the remainders in fee which were approved by the statutes. He intended to limit the power of devise, and subject the trusts which he created in favor of his daughters to that branch of our act concerning estates, which transfers not only uses but trusts into possession, thus changing them from equitable into legal estates. He intended to create a trust power in the executors to make partition, which is also allowed by the statute, and which has been executed, and well executed in this instance, by a division of the estates into unequal parts between the sons and daughters. Yet the decree has cut off all the will except this trust power. It seems to me that if we adopt any other rule of intent beside that which saves what agrees with the statute, we introduce endless *uncertainty*; and provided there be the least defect in a will, no man will dare to act under it until he has first taken the opinion of this court. Pursue the case before us, of a flaw in the power to make leases, all the parts being good. Under the arbitrary notion of intent, which this bill opens upon us, one judge thinks the life estates must go, retaining all the rest; another is not suited with the remainders; another plucks out the devising power, and another, as in the instance before us, sweeps away the whole, except the trust power for making partition. Finally a vote is taken, and the will becomes fash- [305] ioned to nothing by the kind wishes which began in a desire to reform it into a harmonious whole. One tells us if the general intent be defeated,

Root v. Stuyvesant.

the whole will is gone. What is that general intent which seeks for interpretation beyond the law of the land? (a) I know of none more general than that the whole will should stand in all its parts, and as much of it as possible. If the least portion fail, as some small part generally must, then upon the principle put forward in argument, the whole must go down with it. In this will, the large annuity to the widow must fail, and the legacies to the children; for all the dispositions of both the real and personal estate were intended to avail. Can any executor or claimant under the will divine, can any lawyer advise, where the court will stop in the progress of demolition? I do not believe that this court stands committed by any case to a line of judgment so very arbitrary, whatever may have been the *dicta* of eminent judges. We are dealing with the law of property, and our duty lies in promulgating such rules as shall be plain and of easy application. " Certainty," says Lord Coke, " is the mother of repose." And I think I have shown that nothing can be farther from it than the law of wills, if we run into a system of intent, to be guessed at from such circumstances in and out of the will as we may happen to be informed of. Sure I am, it would be better to take the side of absolute destruction, and condemn a will to the flames for the most trifling slip in the most trifling thing, than to leave our suitors in the wandering mazes of metaphysical speculation. On discovering the knot, it were better to cut it asunder with the sword of justice, than to seek to extricate it by the process of desultory and experimental litigation. Sometimes a quick dispatch, even with death itself, is counted a great favor. *Iniquissima pax est anteponenda justissimo bello.* " Better," as the present chief justice remarked in *Coster* v. *Lorillard,* (14 *Wendell,* 349,) "that the intent of a testator should fail in a particular case, than that the court should assume such arbitrary and [306] undefined discretion over his estate." I do not hesitate to add, it were better that the power of making wills should be stricken from existence.

It would have been some consolation, when we were told of the darkness of 1833, and that we are to presume ignorance of the true construction of our new statutes at that period, could we have been told, or could we now tell, at what era the eclipse shall be considered as removed. That cannot be, I should imagine, so long as we leave the effect of a void clause entirely undefined—so long as it resides in the discretion of this court, to fix the intent of the testator, independent of any rule which shall govern the conduct of others. A man who could not understand the statute, or the consequences of mistaking it, upon a simple reading, will so long search in vain for any certain guide among our decisions. They will lead but to bewilder, and the night which still grows darker, is thus beset with snares, and rendered fearful by storms.

How different is the benign and conservative language of the common law, a law which may truly be said to come like a nursing father, to kindle a *light* and dispel the darkness, to rear a shelter from the storm, to distinguish and separate the good from the bad, saving the former and withdrawing its countenance from the latter only. That this is so, whether the person seeking protection in the enjoyment of his rights derive them from instruments partially avoided, either by its own condemnation, or that of a statute, was declared in *Doe, ex dem. Thompson,* v. *Pitcher,* (2 *Marsh.* 61. 6 *Taunt.* 369, *S. C.*) That was a case at law upon the construction of a deed. *Filbury* v. *Barbut,* (3 *Atk.* 617,) was on a will before Lord Hardwicke, in equity, who struck off an ulterior devise in fee as void, but saved a previous one. He said : " I cannot go on the presumption the testator did not know the law." If the law be severe in any of the like cases, it is certainly so on instruments designed as an execution of powers, yet in *Alexander* v. *Alexander,* (2 *Vesey, sen.,* 644,) the master of the rolls said: " Suppose a power to lease for twenty-one years, and he leases for forty ; that shall be good for the twenty-one, because [307]

(a) What is meant by a general and particular intent of the testator? *Vide Dom. B. 3, tit. 1 §* 5, *art.* 19, *infra.*

*Root v. Stuyvesant.*

it is a complete execution of the power, and it appears how much he has exceeded it. If the court can see the boundaries, it will be good for the execution of the power and void as to the excess." In *Thellusson* v. *Woodford,* (4 *Vesey,* 325,) Buller, J., followed Lord Talbot, when he declared that in the case of wills, " the method of the courts has been, *not* to set aside the intent because it cannot take effect so fully as the testator desired ; but to let it work as far as it can." That was said in so many words by Lord Talbot, in *Hopkins* v. *Hopkins,* (*Cas. Temp. Talbot,* 50.) In *Hawley* v. *James,* (16 *Wendell,* 144,) Mr. Justice Bronson said : " Distinct independent provisions, which are in themselves free from objections, will not be invalidated by other separate provisions which are contrary to law." In short, these sound views have grown into a maxim applicable to almost every legal transaction ; *Valeat quantum valere potest.* To deeds, wills, and the execution of powers, may be added, judgments, awards, and all contracts, releases and discharges. But above all, should the rule be applied to wills for the reasons given by Mr. Justice Doddridge, (*Shep. Touch. Pref.; * 1 *Wood Lect.* 221, 222,) who says, " a will hath a more favorable interpretation than a deed, because men's wills are ofttimes made in haste, and it is presumed men take who they can to make them ; but men, for the making of their deeds, are not put upon those straits ; but they take advice of learned men therein." " In Portugal, a man marrying and making no settlement, and having issue of the marriage, can dispose by will of only one sixth of his estate. Yet if the bequest be of more, it shall be good for one sixth, though void for the excess. (Sir John Nicholl stating the evidence of the law of Portugal, in *Hanley* v. *Barnes,* 3 *Hagg. Eccl. R.* 373.) All this is but vindicating the wisdom of two thousand years, and of every court in Christendom. *Domat* (*B.* 3, *tit.* 1, § 5, *art.* 19) condenses the rules both of the civil and canon law, thus : " That which may be valid ought not to be annulled because of its connection with that which is invalid. *Utile non debet per inutile vitiari.*" And he puts a stronger case than the one before us, the case of a devise *totally failing* as to some of the devisees, but being valid as to [308] others. It is equitable, he says, that the will should subsist as to the valid dispositions, since they have no necessary connection with those which are void. And he adds the following rule as to intention : " For as his will is general with respect to them altogether that they should have their effect, so his will is in particular with respect to every one of them that it should be executed, even though the others could not have their effect." And this is precisely what was held under our own law in *Herle* v. *Greenbank,* (1 *Vesey, sen.,* 298.) The will undertook to dispose of real and personal estate ; it failed as to the former, but was valid as to the latter ; and was maintained by Lord Hardwicke in that shape. Two cases exactly similar are put by *Domat,* in the article before cited. He says, where the case is concerning the validity of *one act,* " in which are contained two things, that have some connection with one another, if one of the two cannot subsist, yet the act is nevertheless valid for that which may subsist without the other." In the same article he says : " Even in cases which relate to one only thing, which can admit of no division, the laws suppose a division therein, in order to make the act subsist so far as is possible."

The case in hand, however, requires no refining in order to see that here are two things perfectly distinct ; a line of estates complete and valid of themselves, the power which fails having no necessary connection with them. They are as distinct as the trust term and remainders were in *Ooster* v. *Lorillard,* (14 *Wendell,* 265,) wherein the words of the present chief justice (at *p.* 348) are remarkably applicable. " I have no difficulty," says he, " in conceding, if the trust term had been valid in this case, and the ultimate remainder over void, that under the rule of approximation the term would have been sustained." He cites several cases, and adds that these and others would have afforded abundant authority. " The will, then, as far as sustained, would have been consistent and reasonable, as well as in pursuance of the testator's intent."

Root v. Stuyvesant.

But admitting we are to presume that the testator *was ignorant* of the law, [309] and therefore has not legally expressed his true intent, and that we are so to mould this will as, under all the circumstances, to make it speak his views; are we quite sure that he intended to give a fee to his children? He devises to them but an estate for life, with an attempt to give a leasing power; the fee he gives to his grand-children; we are asked to cut off the estate of the latter, decidedly the most important, and give it to their parents. The pretense set up is, that their necessities require they should have power to sell out a part of the property of their children in the form of city lots, and the respondent has accordingly contracted to convey the fee of one of the lots. The testator, it is said, manifested a disposition to deal in that way as to some of his property. What portion of the land passing under the will lay in that form, we are not told. Some part of it did; probably a great portion did not. If it follows, that because the testator was willing to sell certain lots himself, he intended his children should do the same with the like kind of property, I should hardly suppose that would be a reason for destroying the will, and giving them an absolute estate in other lands which do not come within the same reason. But even with respect to the lots, does it follow, that because the testator himself was willing to sell in fee, he was willing to trust his children with the same power? He has told us not. He knew their necessities and habits; and chose himself to provide for his grand-children. By giving the children a fee, we subject the land to the payment of their debts. If we allow them to sell it off, the avails may be dissipated. The testator, aware of the propensities among men to extravagance and speculation, determined to withdraw his own property from all danger of being wasted by such means. It seems to me, therefore, that we come much nearer his intent by saving the life estates to the children, as the will intended, with the remainders to the grand-children. The chancellor himself does not suppose that the testator would have devised the land in fee, or have suffered it to descend, merely because the statute took away the power to lease city lots. He thinks he would either have done so, or devised an absolute term for 63 years. The latter I [310] should suppose to be much the most probable, when I see his express intent to withhold the fee.

As to the power of devising, if that be invalid, no injury therefore arises to the children. But the chancellor does think it an evil that the trust for the benefit of the daughters should be turned by the Revised Statutes into a legal estate, and subjected to the power of the husband. Such may be the consequence; but surely the evil is not mitigated by giving them a greater legal estate than they took under the statutes; yet that is done by the decree. Under the statute, they alone could suffer. By giving them a fee, we place the power in their hands to ruin themselves and their children too, by alienating the whole estate on the request of their husbands; the remedy appears to me worse than the disease. As the devise to the daughters now stands, it is in perfect conformity to the statute, which intended to execute all such trusts as are merely formal. It is no argument for destroying a will that has carried out the intent and policy of the statute. If we disallow wills both because they depart from, and because they conform to, the statute, there is indeed an end of all devising power.

But without resorting to such a rule, there are consequences claimed by this bill sufficiently extravagant in all its departments. The great burthen of the argument is, that the immediate devisees have not got enough for their own purposes. "The mere life estate is worthless," say the learned counsel. The interests of the devisees and the city have not been sufficiently regarded by the testator: "give us a fee," say the devisees. Was there ever a will against which such an argument could not be urged? Was there ever a will wherein the devisees did not imagine they could do themselves better justice than had been done by the testator? A lawyer, perhaps, finds a technical flaw; the pen of the scrivener has tripped in some collateral provision, and stumbled outside

165

Root v. Stuyvesant.

of the legal boundary; ingenuity magnifies the mistake, whatever it may be.; a figure in the process has been mistaken, and by an easy analogy to the [311] problem in mathematics, the whole becomes vicious. The remote claimants are either infants or unborn children; their voice is not raised, or is drowned in the clamors of the more immediate devisees; the doors of justice are forced open, and her temple becomes an arena for the assaults of cupidity. The combat thickens as time passes on and interests multiply. Mr. Wilder has become, as he tells us, a purchaser to a large amount, and assumes a stand by the side of the respondent. He takes other ground. In the first place he finds, not a perpetuity, but what he thinks an approach to perpetuity. Not being satisfied, however, that the will is contrary to law, he thinks it is, in the result, unsound in point of morals and policy. He has discovered in the leasing power, a new and very laudable intent in the testator to prefer education to wealth; and that he inserted the power to create a kind of school fund for his grand-children, which having failed, a decree should therefore be made for a fee and a sale, to reach that purpose in another form. Such a purpose is neither expressed in the will nor alleged in the bill of complaint, beside the difficulty of taking judicial notice that the grand-children were destitute of education. The argument might certainly take rank with others which have been urged, if the facts which it assumes made in any way a part of the case. When a bill shall be filed against Mr. Wilder, by the devisees from whom he has purchased, such facts and intents can be alleged. No doubt he will readily admit them in his answer. Neither does it appear but that the life estates and other property, when taken together, will form an adequate fund for the purposes supposed. We are not even informed as to the number of grand-children, nor how far they may deserve the attention to their education which Mr. Wilder thinks it his duty to suggest. It is very clear, however, to my mind, from what I have before said, that under no circumstances should we, upon this will, have a right to travel away from its words, and conjecture what the testator's ideas were on such a subject. I admit, however, that Mr. Wilder has the merit of surmising an intent, which has not before been thought of. He adds also the knowledge of the testator that the certain [312] prospect of a fortune is ruinous to a young man and renders a young woman an object of speculation; and he thinks it a work of merit to aid him in cutting off from grand-sons and grand-daughters such pernicious expectations. Judging from appearances, the latter evils will certainly be removed if we sanction the decree.

It appears to me that the case before us very strikingly illustrates the danger of interfering with last wills and testaments on slight grounds. Although some of the city lots may not be available under the scheme of the will, and the respondent may not make so much money by their sale as if he can persuade us to allow him a fee, he has nowhere told us whether the deficiency may not be made up in other parts of the will. It is sought to break it down in respect to the whole *real property* to which he comes in for his full share. Where are the mansion-house, the out-houses, gardens, grounds and farms? Where are the other houses which probably formed a part of this splendid estate, all of which came to these children? Where is the personal property? The will, I see, speaks of plate and furniture, and a very valuable personal estate, which are also bequeathed to the children. Three thousand dollars per annum are bequeathed to the widow; and this very respondent is sought to be relieved from a debt of 29,000 dollars. We can hardly suppose that a fortune apparently so large, was without a considerable share of productive property, real and personal; and the counsel concede that if this were so, we might reasonably conclude the testator intended to give the life estates, though the power might fail. Had the bill given us a full account of this estate in all its branches, and the large sums which the respondent has immediately derived from it, the argument sought to be raised from the testator's passing over the fee of the lots to others, might have appeared to be as

Root v. Stuyvesant.

unfounded in fact as it clearly is in point of law. In truth, we have no legitimate proof in the case. The respondent, one of the devisees, the very man who claims a fee upon the ruins of the will, comes in and tells us a story best suited to his interests. The purchaser of a single lot from him, also strongly interested that we should believe the respondent, confirms the story by his answer. Neither [313] the bill nor answer are even sworn to. Not a witness is examined; and, if possible, the case is made still weaker, by more than a suspicion arising on the face of the will, that facts which would bring the case to a different complexion, have been suppressed by the parties. In any view, this is a new way of enlarging life estates and docking remainders. If it be not collusion, it is something very like it; and it appears to me that by endorsing this title, we would be doing great injustice in more than one way. We may bring a cloud over the claims of the ultimate remaindermen without benefiting the purchaser. We cannot make him safe. The ulterior claimants are not before us, and will not be concluded by any thing we can decree. Should we authorize a sale, and the avails of the real property be dissipated, other and adverse interests will spring up, and a very different case be presented. We shall then be told, that the whole is an expedient of parents to get into their own hands by a decision of this court, property honestly belonging to their children under a devise from their grandfather. Suppose the parents to prove insolvent, dissipated, or extravagant, it would be a disgrace to the law should we break up the titles of these innocent objects of the testator's bounty, and put them to the hazard of final loss by an idle slip of the pen in the creation of a leasing power.

On the whole, all the provisions in the will, except that for leasing, being as I think valid to their full extent, my conclusion is, that we have no power to disturb them. If we have the power, on the notion of consulting the testator's intent, I feel equally clear that we should altogether violate that intent by creating a fee in his children. That fee belongs to others, according to the clearest expressions in the will. I am, therefore, of opinion that the decree of the court of chancery should be reversed.

By Senator DICKINSON. The will in question in this case, was made and published on the 28th of October, 1828, containing various special provisions, which were *then legal* and *valid;* but it was republished with a cod- [314] icil in 1833, which brought it within, and subjected it to, the provisions of the Revised Statutes, by which it is contended, many of its most interesting and material provisions were declared illegal and void. This, to some extent, is conceded by the appellant's counsel; but they insist that *some* provisions of the will, essentially affecting the respondent's title, are in full force and should be carried into execution; while the respondent's counsel contend, that the valuable features of the devise having been declared void by statute, the whole force and intent of the will is destroyed, and that the estate descends to the heirs at law.

By an examination of the will in question, it will be seen that it originated in one of those vain and mistaken efforts of human ambition, to rear and perpetuate a monument of accumulated wealth, upon which a long line of descendants might rise above the storms and floods of poverty and adversity; and that its progress was arrested by the Revised Statutes, which confounded the language of its builder. Without descending to the minutiæ, it is sufficient for my purpose to notice briefly the leading and prominent provisions of the will: By it the testator sought to give his vast estate to his executors in fee, in trust for his posterity, to make partition and to convey to sons for life, and to trustees for the daughters for life, with power to lease not exceeding sixty-three years; authorizing each of his sons, in the language of the will " to devise and appoint the land and real estate so conveyed to his use for life, to, or in trust for, any one or more of his children, grand-children, nephews and nieces, for such estate or estates, and subject to such powers and provisions as he shall think fit; and for want of such appointment, and so far as the same shall not extend, the said

Root v. Stuyvesant.

land and real estate so devised, to be conveyed to such son for life, shall, after his death, go to the children of such son him surviving, and to the child or children of any child of such son who may have died before him, and their heirs as tenants in common; the child or children of a deceased child of such son to take such share only as his, her or their parent, if living, would be [315] entitled to, and if such son shall die, leaving no child, or grand-child surviving, then, for want of such appointment, and so far as the same shall not extend, the land and real estate last aforesaid, shall go, after such son's death, to my own right heirs forever; and my executors are to convey the share of each son in such manner that these directions may be carried into full effect." This "*item*" relates particularly to the sons, but it is substantially repeated in the devise to the daughters. In short, he gives all his real estate to trustees for his children for life, and obliges them to continue it in the family, in conformity with the directions contained in the will, and if they do not, he declares that their children and grand-children shall take it by descent from *him*. This is the splendid scheme, whereby the testator sought to perpetuate his family fortune Although its provisions are numerous, and on a *cursory* examination may appear to be separate and distinct, yet it has neither beauty nor utility, except as a whole; and however independent any particular provision may seem to be as to the letter, all the *parts* are necessary to the *whole* to preserve its spirit, for when the clauses and provisions, which it is conceded are void, are abstracted, the whole edifice will totter.

The Revised Statutes make the following summary inroad upon this last will and testament, leaving a meagre skeleton of what came from the hand of the testator. *First.* They declare the devise of the real estate to the executors in fee in trust, void. (1 *R. S.* 722, § 47, 49.) In *Salmon* v. *Stuyvesant*, (16 *Wendell*, 324,) in passing upon this will, Mr. Justice Cowen says: "The codicil brought the will confessedly within the operation of the Revised Statutes, which transferred into the possession of both the sons and daughters, all the uses and trusts devised to the executors. The executors took no legal estate." *Second.* They destroy the right of the testator to perpetuate the property in his family, in the manner and to the extent provided by the will. (1 *R. S.* 718, § 17. *Id.* 730, § 129.) *Third.* They cut off the power of the life tenants to lease for over twenty-one years, which is sought to be given by the testator. (1 *R. S.* 726, § 87. 16 [316] *Wendell*, 325.) *Fourth.* They substantially destroy the trusts created for the protection of the married daughters of the testator. (1 *R.S.* 722, § 47, 49.) It now remains to be seen, whether there is any substantial part of the will which can be executed. It is doubtless the rule, that any "*independent intent of the testator, which is not bound to, nor interwoven with any other part, may stand, although other portions of the will fail.*" The intent of the testator must be ascertained by an examination of the whole instrument, and when ascertained, must be carried into effect, so far as the same is consistent with the rules of law. (1 *R. S.* 740, § 2.) If we can find any separate and independent intent of the testator in this case, we shall be bound to give it force; but it must be an independent intent in *substance* and not in *form;* nor must it be an empty shadow, depending for its being, upon a part which has been rejected as illegal and void.

The *power to lease* for sixty-three years, is one of the most material provisions of the will. This, it is conceded, is void for *that term;* but it is said that this power may be exercised in conformity to the statute, and if so exercised, will be good for twenty-one years. Although the devisee *may*, I admit, *attempt* to execute this power in obedience to the provisions of the Revised Statutes, yet it is against all reasonable inference to suppose that he will do so, if such execution renders his estate worthless. If we are permitted to indulge in speculations, it is far more reasonable to suppose that he will so execute it as to render the estate most available. But without regard to what the devisee may or may not do, I

Root v. Stuyvesant.

apprehend the power is void for twenty-one years, for the reason that it was not "*enumerated and defined.*" (1 *R. S.* 727, § 92.) Divested of the power to lease for a long term, this life estate is valueless. The peculiar situation of the property was well known to the testator. He was aware that a mere life estate in it would be worthless indeed, that it would be subjected to heavy taxes and assessments before it could be rendered productive, and hence the power to lease for sixty-three years, by which his children could in all probability realize a large income. Although we cannot look at the thing devised, for the purpose of giving construction to the will, we can certainly do so, for [317] the purpose of ascertaining the intention of the testator. The will sought to give *bread*, but legislation has turned it to a *stone*, and still it is insisted that it shall be forced upon the children of the testator without regard to its change of quality. To this doctrine I am not prepared to subscribe. Unless we can carry out the real intentions of the testator, I can discover little justice or utility in mocking his descendants by the mere scraps of his will, which have not been reached by legislative enactments. The whole beauty and harmony of this will is broken down by the strong arm of written law. We are not permitted to refashion it after the plan of its projector; but can only gather up the disjointed fragments, and unite them with judicial cement. It will then neither speak the language of the testator, nor do justice to his children. As a will, it will counteract the law of descent, and give only a naked life estate in name, weighed down by numerous contingencies, and this too, to the children of his body, who it is evident he intended should participate liberally in his bounty. This patrimonial tree offered shelter and shade to the children of the testator. Its foliage has been withered, and its branches lopped off by the omnipotence of legislation; but they are pointed to its naked and sapless trunk and there invited to seek repose and protection. The whole life and spirit of the will has departed, and the effort to resuscitate it by judicial power, will be as unavailing as an attempt to " back to its mansion call the fleeting breath" of Nicholas William Stuyvesant. We cannot warm it into life and being, nor reinvigorate it with the soul breathed into it by the testator; but as an inquest to declare the cause of its death, we should pronounce it to be that of legislative visitation. Is, I ask emphatically, this scarred and mutilated instrument, or any separate or independent provision of it, the last will and testament of Nicholas W. Stuyvesant? Would he have set to it his hand and seal as such?. I cannot believe it for a moment.

In *Coster* v. *Lorillard*, (14 *Wendell*, 349,) Chief Justice Nelson says, " *If we cannot execute the whole will, or some distinct or independent intent, the* [318] *whole had better be declared void. The law makes a better one than will usually be made by the court.*" I am unable to discover how we can execute this will in any substantial, distinct or independent provision. If executed at all, it must be at war with the spirit of the testator's intent, as indicated by the whole tenor of the will, and every fact and circumstance connected with it, either *immediately* or *remotely*. I cannot consent to force the mere language of the testator upon his heirs, when the object to which it relates has been placed beyond their enjoyment; or to go through the idle ceremony of pretending to execute his will, when we are compelled to pronounce everything of a substantial character void. The decisions of this court, while they should keep steadily in view the great leading principles of law, should break through mere nets of form, and strip questions of all artificial or technical considerations. In this case, it is better that the testator's property should descend to his heirs, according to the just and equitable principles of the statute of descent, than that a will should be patched up for him which would both defeat his intentions, and leave his heirs destitute in the midst of abundance. I am, therefore, for declaring the will void *in toto*, and affirming the decision of his honor, the chancellor.

On the question being put, *Shall this decree be reversed?* the members of the court divided as follows:

*In the affirmative:* The PRESIDENT of the Senate, *Chief Justice* NELSON, *Justices* BRONSON and COWEN, and *Senators* LAWYER, TRACY, WAGER—7.

*In the negative:* Senators ARMSTRONG, L. BEARDSLEY, BECKWITH, DICKINSON, DOWNING, EDWARDS, FOX, HUNTER, JOHNSON, F. H. JONES, J. P. JONES, LACY, LIVINGSTON, LOOMIS, McLEAN, MACK, MAISON, PAIGE, POWERS, SEGER, SPRAKER, STERLING, TALLMADGE, VAN DYCK, WILLES—25.

Whereupon the decree of the chancellor was AFFIRMED.

