## WRIGHT *vs.* PAIGE.

Words charging one with keeping a whore house are actionable, *per se*. They impute a crime involving moral turpitude, and which crime is also an indictable offense.

The charge of keeping a whore house is synonymous with a charge of keeping a bawdy house, or house of ill fame; it being a charge of keeping a house for common prostitution.

In an action for slander, the words are to be construed according to their common acceptation; and it is not admissible to inquire of the witnesses how they understood them.

After impeaching witnesses are shown to be acquainted with the general moral character of the person whose credit is assailed, and they declare it bad, the question of credit is for the jury, under proper comments from the court, without any inquiry of the discrediting witnesses as to whether they would believe him under oath.

In such cases the jury ought not to be precluded from drawing the fair and reasonable inferences from the evidence.

THIS was an appeal from a judgment entered at a special term, after a trial by a jury, at the circuit. The action was for slander. The words set out in the complaint were the following:

"Ah! you (meaning plaintiff) damned scoundrel, I (meaning defendant) will see the end of you yet. There is nothing of you; you have nothing but whores about you; you (meaning plaintiff) keep a whore house; you have brought up two girls whores; now you have another you are bringing up the same way. Go home and take care of your whores." He, the said defendant, thereby then and there imputing and intending charging, and intending to charge, falsely and maliciously, that the plaintiff had been and was guilty of the odious crime, offense and misdemeanor of keeping a bawdy house, &c. The plaintiff recovered a verdict for $400 damages.

*Isaac W. Thompson*, for the appellant.

*O. F. Davis*, for the respondent.

*By the Court*, BOCKES, J. Appeal from a judgment. The action is for slander. The words charged, among other op-

Wright *v*. Paige.

probrious epithets, were that the plaintiff kept a whore house. No special damage is alleged, nor does it appear that any was proved or attempted to be proved. The plaintiff proved the uttering of the words by the defendant, and had a verdict in his favor

It is urged that the words are not actionable, *per se.* In *Martin* v. *Stillwell*, (13 *John.* 275,) the words were, "Mrs. Martin kept a bawdy house." Held actionable. This case is referred to and approved in *Young* v. *Miller*, (3 *Hill*, 21,) where Judge Bronson remarks that such a house is a common nuisance, and the person keeping it may be punished by indictment; and after citing some other cases, he adds: "In all these cases the court proceed on the ground that the words impute a crime involving moral turpitude, and for which the offender may be proceeded against by indictment."

Words, to be actionable *per se*, must impute a crime involving moral turpitude punishable by indictment. It is not enough that they impute immorality—moral dereliction merely—but the offense charged must be also indictable. At one time it was supposed that the charge should be such as, if true, would subject the party charged to an infamous punishment; and it was so urged in *Widrig* v. *Oyer*, (13 *John.* 124.) But the court declined to so hold. And in *Martin* v. *Stillwell*, (*supra*,) it was laid down that if the words imputed moral turpitude, and charged an indictable offense, they were actionable, although the offense charged could not be punished by an infamous punishment. So in *Alexander* v. *Alexander* (9 *Wend.* 141) it was held sufficient if the words charged would, if true, subject the party to criminal punishment of any description. The case is cited, and the rule was approved and adopted in *Young* v. *Miller*.

The offense charged in *Young* v. *Miller* was but a misdemeanor, not a felony; but the words imputed a crime involving moral turpitude, and for which the offender might be proceeded against by indictment. The words were held actionable. In *Bush* v. *Prosser*, (13 *Barb.* 221,) a recovery

was allowed in slander for charging the plaintiff with keep-
a bawdy house, or house of ill fame.

In this case the words charged are, that the plaintiff kept
a whore house; and the complaint contains an innuendo alleg-
ing that the defendant by such charge falsely and maliciously
imputed to the plaintiff the crime and offense of keeping a
bawdy house. The court was requested to charge, and did
charge, the jury that in order to sustain the action they must
find that the defendant intended, by the words counted on
and proved, to charge the plaintiff with what was equivalent
to keeping a bawdy house for public prostitution. This cer-
tainly was going quite as far as the defendant had any right
to ask. The charge of keeping a whore house is synony-
mous with a charge of keeping a bawdy house, or house of
ill fame.

The words are to be taken in their natural meaning, and
according to common acceptation; in other words, according
to their plain and natural import. (*Carroll* v. *White*, 33
*Barb.* 615, *and cases there cited.*) By common acceptation,
to keep a whore house is to keep a bawdy house, or house
of ill fame. Indeed, to charge the former is equally oppro-
brious and more directly and unquestionably significant, if
possible, than to charge the latter. It is a coarser expression,
conveying the same idea. It is most clearly a charge of
keeping a house for common prostitution; which is the pre-
cise definition of a bawdy house. It is needless to say that
such charge imputes a crime involving moral turpitude. This
crime is also an indictable offense.

A bawdy house is a common nuisance, and the person
keeping it may be punishable by indictment. (*The People*
v. *Jackson*, 3 *Denio*, 101. *The People* v. *Erwin*, 4 *id.* 129.
*Young* v. *Miller*, 3 *Hill*, 21.) By the statute the offense
is punishable with imprisonment at hard labor, and on bread
and water. (1 *R. S.* 638, §§ 1, 2, 10.) It is therefore clear,
on principle and authority, that the words charged in the
complaint, and for which a recovery was allowed, were action-

Wright v. Paige.

able. The objection that the complaint did not contain a cause of action, and the exception to the refusal of the judge to charge the jury that the plaintiff had not charged or proved a cause of action, were not, nor was either, well taken.

The defendant requested the court to charge the jury, that inasmuch as the witnesses had not sworn that they understood the defendant to mean by the words spoken, that the plaintiff kept a bawdy house for public prostitution, the plaintiff had failed to show actionable words. The court properly refused so to charge. As has been said, the words were to be construed according to their common acceptation. It was for the witness to state them and the circumstances under which they were uttered, and their import was for the court and jury. It is not admissible, on the trial of an action of slander, to inquire of the witnesses how they understood the charge. (*Gibson* v. *Williams*, 4 *Wend*. 320. *Van Vechten* v. *Hopkins*, 5 *John*. 211.) The court decided correctly in refusing to charge as requested.

It seems that an attempt was made to impeach a witness produced by the defendant, by whom he sought to prove a justification of the slander. In fact no justification of the slander whatever was shown by her, and the evidence was entirely immaterial on that issue. But it was not objected to, and if credible bears, perhaps, on the plaintiff's character, and in that way was of some importance on the question of damages. I will therefore examine the exceptions interposed to the ruling of the judge, on that branch of the case, without deciding however that the evidence was admissible, had it been objected to.

On the question of impeachment, evidence was given showing that the general moral character of the witness was bad, and that her general character for honesty and integrity was bad; also that she was reputed to be unchaste and to possess a disposition to steal; and that she kept a place for the sale of liquors, which was the resort of vile characters. The witnesses were not asked whether they would

believe her under oath.   No evidence was offered to sustain
the witness, nor was any objection taken to the sufficiency
or completeness of the impeaching testimony, until the sum-
ming up by the counsel to the jury, when it was insisted that
the impeachment was ineffectual, inasmuch as no one had
sworn that he would not believe the witness under oath.   The
court charged the jury that they would take into considera-
tion the manner of the witness when testifying, the nature
of her evidence, whether or not consistent, and also the evi-
dence of the witness called to impeach her general moral
character, and determine whether they would believe her
statement; and that it was not necessary, under the circum-
stances of the case, in order to impeach her, that the witnesses
who testified to her general moral character, should have
been asked whether they would believe her under oath.   To
the latter clause of this charge the defendant's counsel ex-
cepted, and requested the court to charge, that inasmuch as
it had not been proved that the witness, by whom her char-
acter was shown to be bad, would not believe her under
oath, she was not impeached, and that the impeaching tes-
timony in that behalf was of no force.   The court declined so
to charge.   The learned judge was manifestly right, both in
his charge and refusal.

As to the charge, it was not necessary, *under the circum-
stances of the case,* to ask the impeaching witnesses whether
they would believe her under oath, if indeed it be necessary
under any circumstances, for the purpose of a successful im-
peachment.   The attention of the jury was called to the con-
duct of the witness while under examination, her manner of
giving evidence, its probability or consistency, from which we
are to infer that these were proper subjects of remark; espe-
cially must we so infer, as there was no exception to this part
of the charge.   If her conduct and manner of testifying
were insincere or reckless, and her statements improbable and
contradictory, this would be enough to authorize the jury to
discredit her.   Circumstances attending the examination of

a witness may, without countervailing proof, become so over-whelming as utterly to destroy his evidence.

It was not necessary, therefore, to the impeachment of this witness, that another should swear that he would not believe her under oath; nor was it any the more necessary, for the reason that several witnesses had also sworn that she was of notoriously bad moral character.

As regards the request to charge, that the witness was not impeached because it was not proved that the persons by whom her moral character was shown to be bad would not believe her under oath, it is sufficient to say that she stood impeached, perhaps, by other evidence than that given by these witnesses. At any rate, there was other evidence tending to her impeachment, and hence it would have been improper to charge as requested. As part of the same propo- sition, the judge was requested also to charge that the im-peaching testimony in that behalf had no force. The request must stand or fall as an entirety, and if any part of it was improper the judge was right in rejecting it. A proposition on which a judge is asked to charge must be good in all its parts, both as to the law and facts, or he may refuse to give the instruction asked for; and he may do so without qualifi-cation. (*Doughty* v. *Hope,* 3 *Denio,* 594; *same case on appeal,* 1 *Comst.* 79. *Zabriskie* v. *Smith,* 13 *N. Y. Rep.* 322. *Cronk* v. *Canfield,* 31 *Barb.* 171. *Haggart* v. *Mor-gan,* 5 *N. Y. Rep.* 422. *Magee* v. *Badger,* 30 *Barb.* 246. *Jones* v. *Osgood,* 6 *N. Y. Rep.* 233. *Van Kirk* v. *Wilds,* 11 *Barb.* 520.) In this view, therefore, the learned judge very properly declined to charge as requested.

But suppose the impeachment to rest solely on the evi-dence of those persons by whom the moral character of the witnesses was proved to be reputedly bad, was the impeach-ing testimony "of no force" without showing further, by those persons, that they would not believe the witness under oath? On the question of general impeachment, the credi-bility of a witness is to be determined from general character.

After one has so conducted in community that he has earned the reputation of being a person of notoriously bad character, he is open to discredit in a court of justice. This is the common sentiment of mankind. But the point here is as to the kind and extent of proof necessary to the submission of the question to the jury, in case of an attempted general impeachment. The mode of establishing a general impeachment of a witness is by an examination into his character— his moral standing in community. The inquiries should be made of his neighbors, or those acquainted with his reputation and standing. An inquiry, however, is not allowed as to any particular offense, species or class of crimes or immoralities. As was said in *Bakeman* v. *Rose*, (18 *Wend.* 146,) you cannot inquire whether the witness has the general reputation of being a thief, prostitute, murderer, forger, adulterer, gambler, swindler, or the like; although each and every of such offenses, to a greater or less degree, impairs the moral character of the witness, and tends to impeach his or her veracity. But the inquiry must be general in its scope and tendency. What should be the question in such case, both as regards substance and form, has often been matter of grave discussion. In *Phillips on Evidence*, (*see text*,) the rule is stated thus: The regular mode of examining into the general character of a witness is by inquiring of the witnesses, who are called to impeach it, whether they have the means of knowing his general character, and whether with such knowledge they would believe him on his oath. In *Cowen and Hill's Notes* we find it said, that in general the proper question is whether the discrediting witness knows the general character of the witness sought to be impeached, in respect to truth, among his neighbors; and what that character is—whether good or bad. *Greenleaf* lays down the rule thus: The regular mode of examining into general reputation is to inquire of the witness whether he knows the general reputation of the person in question among his neigh-

bors, and what that reputation is. *Swift*, in his treatise, remarks: The only proper question is whether he knows the general reputation of the witness in point of truth, among his neighbors, and whether it is good or bad. *Starkie* says: The only proper question is whether he would believe him under oath. It has been held that the question may be asked, what is the general character of the witness in the neighborhood where he resides, as a man of truth; and what is his general character for truth and veracity; also what his general moral character is. On looking into the books, it will be found that the courts have, first and last, given sanction to questions in each and every of the forms above stated or suggested. Not that either or all of them were the only ones which might be put, but that such questions were proper both in form and substance to be asked of the discrediting witnesses. It is well settled, too, by numerous decisions, that in addition to any or all of these questions, the witness may be asked whether he would believe the person, whose credibility is attacked, on oath. *Greenleaf*, after stating the proper mode of examination to be to inquire of the witness whether he knows the general reputation of the person in question among his neighbors; and what that reputation is, says that in the English courts the course is further to inquire whether, from such knowledge, the witness would believe that person upon his oath. But he adds, "*in the American courts the same course has not been pursued,* but its propriety has of late been questioned, and perhaps the weight of authority is now against permitting the witness to testify as to his own opinion." It is admissible, however, in this state, as in England, to superadd to other questions, the inquiry whether the witness, from his knowledge of the general character of the person, would believe him under oath. But, as was remarked by the counsel in this case, the great struggle has been to induce the courts to allow this question to be put. It is now held admissible, but is not, as I am

aware, absolutely essential to a successful impeachment. The decision in *Gilbert* v. *Sheldon*, (13 *Barb*. 623,) does not reach this case, although I think the argument of the learned judge who delivered the opinion of the court may cover it. There the question put went merely to general character, not to general moral character; and this distinction was marked and commented on by the learned judge. If the decision in that case is to the extent that there cannot be an effectual impeachment of a person, without proving by the discrediting witnesses that they would not believe him under oath, I am unwilling to follow it.

If a person is shown to be of notoriously bad moral character, he is certainly a most unreliable witness, and in my judgment it then becomes a proper matter for the jury to determine whether they will credit his statement, without the further testimony from the discrediting witnesses that they would not believe him under oath. If they should so state, it would add very little force, if any, to the other evidence. In the case at bar, a female witness is shown to be of bad moral character—reputed to be dishonest, unchaste, wanting integrity, untruthful, thievish, and a keeper of a resort for vile characters; and the court is asked to charge the jury that she stands before them, as regards the question of general impeachment, a perfectly fair witness—in the exact language of the request, "that the impeaching testimony in that behalf was of no force," and for the reason simply that the witnesses were not asked whether they would believe her under oath. The proposition is contrary to the dictates of reason and propriety—simply absurd.

After impeaching witnesses are shown to be acquinted with the general moral character of the person whose credit is assailed, and they declare it bad, the question of credit is then, in my judgment, for the jury, under proper comments from the court, without any inquiry of the discrediting witnesses as to whether they would believe him under oath.

In such cases the jury ought not to be precluded from drawing the fair and reasonable inferences from the evidence.

I am satisfied that the record in this case is free from error, and that the judgment should be affirmed.

Judgment affirmed.

[CLINTON GENERAL TERM, May 6, 1862. *Rosekrans, Potter, Bockes* and *James,* Justices.]